ASHUELOT R. R. Co. *v.* ELLIOT.                          { August, 1874.

Where a railroad corporation has failed to hold its annual meeting, a justice of the peace who is a stockholder may, on application, issue his warrant for such meeting under Gen. Stats., ch. 133, secs. 15, 16—that being merely a ministerial act—and being elected chairman may legally preside in such meeting.

A railroad corporation executed a mortgage of its road and other property to a trustee, to secure payment of its bonds. The bonds not being paid at maturity, the trustee took possession under the mortgage, and for several years controlled and managed the road and property on behalf of the bondholders. On a bill in equity, brought by the corporation and several stockholders therein, against the trustee and others for an

accounting, and to redeem—*Held*, that the trustee, while so in possession, must be regarded as the trustee of the corporation as well as of the bondholders.

It is inconsistent with the duties which such trustee owes to the corporation to deal in the bonds which the mortgage was given to secure for his own private gain.

Such trustee, after taking possession of the road and entering upon the performance of the active duties of his trust, cannot make a valid contract for the leasing of the road to another railroad corporation in which he is a stockholder and director.

The bonds were made payable on the first day of January, 1861, " with interest at the rate of six per cent. per annum, payable half yearly, at said treasurer's office, on the first days of July and January of each year after the first day of January, 1851, upon the surrender of the corresponding warrants hereto annexed." *Held*, that interest after maturity, and the payment of all the coupons, was recoverable by way of damages for the detention of money due, and should be computed at six per cent. without semi-annual or other rests.

FROM CHESHIRE CIRCUIT COURT.

IN EQUITY. The bill was filed August 30, 1872. This is the same case that is reported in 52 N. H. 387. At the hearing before HIBBARD, J., January adjourned term, 1874, the following facts were reported for the opinion of the court:

The plaintiffs are the Ashuelot Railroad Co., and Samuel W. Hale, Farnum F. Lane, Henry Colony, John E. Colony, and Elisha F. Lane, stockholders in said company, who bring this bill in behalf of themselves and all other stockholders who may come in and join in the suit; and the defendants are John H. Elliot, the Cheshire Railroad Co., William Haile, and Francis A. Faulkner. The individual plaintiffs now own 118 shares of stock in the Ashuelot Railroad, but were none of them original stockholders, having purchased and duly taken transfers of thirty-eight of their shares between about January 1, 1872, and August 17, 1872, and the rest since that time, at prices not varying materially from thirty dollars per share; but the transfers were never entered upon the books of the company. These purchases of stock were made in pursuance of an arrangement entered into by them to buy the outstanding stock for the purpose of enabling them to redeem the Ashuelot Railroad from the hands of said Elliot, who has held the same since about January 1, 1861, as trustee of the mortgage bondholders, by virtue of a mortgage, a copy of which is hereto annexed; and by virtue of a similar mortgage, dated January 2, 1855, of the railroad and franchises situated in Vermont, the Cheshire Railroad Co., William Haile, and Francis A. Faulkner are the holders of nearly all of the mortgage bonds of the Ashuelot Railroad now outstanding,

amounting in the whole to $190,000,—the bonds formerly held by John H. Fuller, amounting to $5,000, having, as I find, been extinguished by the act of Elliot in taking them up, about January 1, 1862, by order of three of the directors. Elliot was clerk and treasurer of the Ashuelot Co. for more than twenty years next preceding August 17, 1872, but no meeting of the company nor of its directors was held, nor did Elliot render any service as clerk or treasurer after the year 1861.

In said bonds, which are dated February 9, 1850, " the Ashuelot Railroad Company acknowledges itself indebted to A. Boody & Co., or bearer, in the sum of ———— dollars, which sum it hereby promises to pay to the said Boody & Co., or bearer, at the office of its treasurer, on the first day of January, 1861, with interest at the rate of six per cent. per annum, payable half yearly at said treasurer's office, on the first days of July and January of each year after the first day of January of the year 1851, upon the surrender of the corresponding warrants hereto annexed." The treasurer made due provision for the payment of all the interest accruing on or prior to the maturity of the bonds, upon the presentation of the coupons, and all the coupons which were presented were paid, and all or nearly all were presented and paid ; but no provision was made for the payment of the principal, and Elliot, on or about February 11, 1861, with the consent of the directors, who acted under a vote of the corporation, took possession of the mortgaged property for condition broken, his possession by agreement relating back to January 1, 1861, and has ever since held the same, and now claims to hold it by an indefeasible title ; but I find (in accordance with the decision in 52 N. H. 387) that the annexed mortgage has never been foreclosed in any of the ways provided by the statutes of New Hampshire, and that the corporation now has a right to redeem.

A short time prior to August 17, 1872, said Samuel W. Hale, Henry Colony, John E. Colony, and Elisha F. Lane, then owning thirty-one shares of Ashuelot stock, duly applied to said Farnum F. Lane, a justice of the peace, who then owned seven shares of said stock, requesting him to call the annual meeting of the corporation ; and a meeting was called by him, and held on said August 17, 1872, he acting as chairman. Said meeting was duly called and held, in pursuance of ch. 133, secs. 15, 16, Gen. Stats., except so far as the validity of its proceedings may be affected by the fact that said Farnum F. Lane was, at the time of calling said meeting and of presiding therein, a stockholder in said corporation, and equally interested with said Samuel W. Hale, Henry Colony, John E. Colony, and Elisha F. Lane in these proceedings for its reörganization, or by the additional facts hereinafter stated.

Just previous to October 9, 1860, the number of shares in said corporation was 2,010, besides 450 shares held by guaranty shareholders, as hereinafter mentioned.

At a meeting of the corporation, held on that day, the directors were authorized " to buy up the shares of the original stock of the company, and do the same if possible before the expiration of November coming,

and in such manner as they, the directors, shall deem for the best interest of those concerned." At an adjourned meeting, held on December 11, 1860, " upon motion, for the purpose of defining and limiting the company's vote of October 9th," it was provided " that all the present issue of stock shall be redeemed at thirty dollars, if the [same] be presented for redemption before the first of July, 1861." On December 18, 1860, a majority of the directors, in writing, directed " that the treasurer be hereby ordered to pay out of the company's surplus a dividend of thirty dollars per share, agreeably to the company's vote of Oct. 9, all payments made already in this behalf being hereby fully sanctioned." In pursuance of the foregoing the treasurer, between October 9, 1860, and about July 1, 1861, procured 1,783 shares of said stock, or about that number, paying at the rate of thirty dollars per share for most of them, and all in money of the corporation, or in its mortgage bonds, as follows: The president and certain directors had undertaken to purchase the outstanding bonds at fifty per cent. of the par value, and had borrowed of the treasurer $22,000 of the money of the corporation, and given their note therefor, and left the money in his hands for that purpose, and he had purchased for them $44,000 of said bonds, and held them as collateral security for the note. The object of this transaction was, to carry out sundry votes of the corporation providing for the purchase of the outstanding bonds at a price not to exceed fifty per cent. of the par value, and the purchase was intended to be in the interest and for the benefit of the corporation, when the project of buying all or nearly all the bonds was abandoned about October 9, 1860, and a plan adopted (as has been already stated) for dividing thirty dollars per share among the stockholders. The signers of the $22,000 note directed the treasurer to pay himself the amount due upon the note by passing off the $44,000 of bonds at their cost (fifty per cent.) instead of cash to the stockholders, themselves receiving a considerable portion of them in exchange for their shares ; and he passed the rest in that way to other stockholders in exchange for shares, giving at the rate of $300 in bonds for $500 in shares. A small portion of said 1,783 shares was procured after July 1, 1861, at a rate less than thirty dollars per share. The certificates were all or nearly all indorsed in blank by the shareholders and delivered to Elliot ; but no entry of any transfer of them was ever made on the books of the company. The corporation has never re-issued any of said shares. I find that the effect of these transactions was, to extinguish all the shares thus procured by the treasurer, leaving on said August 17, 1872, 227 or about 227 outstanding shares in said corporation, the said 450 shares held by guaranty shareholders having been also extinguished as hereinafter mentioned, and therefore that the owners of more than one twentieth of the stock of said corporation applied to said Farnum F. Lane to call said meeting. At this meeting a board of directors was chosen, and Farnum F. Lane was elected clerk and Henry Colony treasurer, either at the meeting or subsequently, by the directors.

Said Elliot appeared at said meeting, and offered to vote upon said

1,783 shares for different persons from those declared elected. His right being contested, he furnished an affidavit setting forth his title to the 1,783 shares, as trustee for the bondholders; but the chairman, upon the ground that they were no longer outstanding shares in said corporation, declared the evidence unsatisfactory, and refused to allow him to vote.

I find that a certain lease for ninety-nine years, made by the trustee to the Cheshire Railroad Co., of a piece of land in the Y (so called) in Keene, was made in good faith, and that it has been and is for the interest of the Ashuelot Railroad Co. to continue it, but that the trustee had no authority to make such a lease.

My conclusions are, that the plaintiffs are entitled to redeem the mortgaged property by paying the amount due upon the outstanding bonds; that an account should be taken of what is due to the Ashuelot Railroad Co. from said Elliot as treasurer, on account of funds remaining in his hands on or about January 1, 1861, and the income and profits thereof, and that he should be ordered to pay over the same to the corporation; that an account should be taken of what is due from him as trustee of the mortgaged property, from the rents and profits which he has received or ought to be accountable for in equity, and he should be ordered to pay over the same to the mortgaged bondholders, or to the corporation, upon its giving satisfactory security for the payment of the bonds; that upon payment by the plaintiffs of the amount remaining due upon the outstanding bonds, after any sum now in the hands of Elliot shall have been applied thereon, the bondholders should be directed to surrender their bonds to the plaintiffs, and Elliot should be directed to discharge his mortgage and surrender to the plaintiffs all the mortgaged property; that, from and after such surrender of the mortgaged property, the lease for ninety-nine years, given by Elliot to the Cheshire Railroad Co., of land in the Y (so called) in Keene, should be set aside and declared void; that said 1783 shares of stock should be declared to have become the property of the corporation, and thereby extinguished until the corporation shall lawfully re-issue the same; that a master should be appointed to take the accounts before mentioned, charging Elliot with all rents received by him, as treasurer, from the Connecticut River Railroad Co., or, as trustee, from the Cheshire Railroad Co., and with all other sums received by him as treasurer or trustee by way of rents, profits, or otherwise, and allowing him for all sums properly paid by him for taxes, for interest upon the mortgage bonds, for principal and interest on the floating debt of the corporation, and for other liabilities of the corporation, or liabilities chargeable upon the mortgaged property, including the several sums paid by him to stockholders by authority of the votes of the corporation, passed October 9 and December 11, 1860; also including a reasonable compensation for his own services, and for expenses properly incurred by him as treasurer, clerk, or manager of the corporation, and as trustee of the bondholders, giving full force to the " settlement of the compensation to be allowed the clerk and treasurer for his services,"

indicated in the record of the directors' meeting held on May 8, 1854, as the same may on investigation turn out to have been; and that if my conclusion that the case ought to go to a master shall be sustained by the whole court, the master should be appointed at the law term, at which the questions arising on this case shall be determined, and should be authorized to proceed to a hearing before the next trial term. The question what instructions shall be given to the master as to the computation of interest, is reserved for the determination of the whole court.

If at the hearing before the master it shall appear that Elliot invested a portion of " a contingent fund of a few thousand dollars " " in the company's bonds at fifty per cent.," as certified by him in a printed statement entitled " Fiscal Condition, January 1, 1861," which he claimed at the trial was inserted in said statement by mistake, the question is referred to the master to determine whether he ought to account for any loss the corporation may have suffered by reason of his not retaining said bonds in his hands, that point not having been sufficiently heard before me to enable me to decide it.

During the construction of the Ashuelot Railroad, about $47,000 of its mortgage bonds remaining unsold, and it being impossible to sell them, it became necessary that the capital stock should be increased; and certain persons (a part of them directors) entered into an agreement with the corporation, by which they guaranteed that they would take or cause to be taken additional shares, not exceeding $50,000. The sums thus taken amounted to $45,000, and those taking them were known as guaranty shareholders. At the before mentioned meeting of the corporation, held on October 9, 1860, the directors were " authorized to redeem the amount of the guaranty shares, so called, of the company's stock, by substituting for the same to the subscribers thereof, or their heirs in possession of their respective amounts, the bonds whose capital they represent,—all due coupons off,—said bonds being made convertible, under conditions indorsed into shares, at any time before the foreclosure of the mortgages by which the same are secured." At an adjourned meeting, held on December 11, 1860, it was " Voted, that subscribers of the guaranty shares, who are not now shareholders on the company's books, shall not be entitled to exchange shares for bonds by hereafter making themselves shareholders." In pursuance of this vote of October 9, the treasurer, soon after it was passed, exchanged mortgage bonds to the amount of $45,000, having coupons on them for the last six months' interest, for a like amount of stock held by guaranty shareholders. The stock in the company was all alike, the certificates representing shares held by guaranty shareholders not differing from those held by common shareholders. The market value of the bonds at the time of this transaction was nearly or quite fifty per cent. of the par value, while the sum paid in procuring the common shares was $30 per share, as hereinbefore stated. The plaintiffs claimed at the trial that the act of the treasurer in exchanging said $45,000 in bonds for stock held by guaranty shareholders was unauthorized, and

that the treasurer was chargeable by reason thereof; but my conclusion is, that he had such authority to make the exchange as to protect him from liability therefor;—but this question is reserved for the determination of the whole court.

Levi Chamberlain was a subscriber for guaranty shares to the amount of $1,000, but he parted with his stock before October 9, 1860. Elliot, soon after October 9 and before December 11, 1860, in order to qualify Chamberlain to get a $1,000 bond in exchange for stock, transferred $1,000 of stock to him, and took the bond himself for his own benefit. This I find was a breach of trust on the part of Elliot, and that the master should charge him with all the corporation has lost by thus giving the bond for the shares instead of allowing to Elliot $300 for the ten shares of stock transferred by him to Chamberlain.

Samuel Towns was also a subscriber for guaranty shares to the amount of $1,000, and had parted with his stock, and was qualified to get a $1,000 bond in exchange for stock in a similar way, by a transfer of $1,000 of stock to him; but at the time of drawing this case, I am unable from recollection, or from an examination of my minutes, to decide whether the testimony showed that Elliot participated in this transaction, or had such knowledge of it as to make him chargeable for the loss which the corporation sustained thereby; and my conclusion is, that the question should be referred to the master to determine, with instructions to charge him for said loss if in the opinion of the master he was so far a party to the transaction as to be responsible therefor.

At the time Elliot took possession as trustee, in February, 1861, he held Ashuelot mortgage bonds to the amount of about $24,000, about $5,000 of which he had obtained in exchange for common shares, and about $5,000 in exchange for guaranty shares, in the fall of 1860, under the arrangements hereinbefore stated, and the rest he had purchased from time to time at something less than fifty per cent. of the par value. From February, 1861, to the spring of 1867, he continued to make purchases of said bonds at prices varying from a point below fifty to sixty-two and a half per cent. or more of the par value, and had obtained bonds to the amount of not far from $70,000 in the whole. At that time he entered into an arrangement with the Cheshire Railroad to aid that corporation in obtaining $100,000 or more of the outstanding bonds, and subsequently made purchases and exchanged Cheshire for Ashuelot bonds in pursuance of that arrangement, until (including the exchange of the Ashuelot bonds held by himself) he obtained for that corporation about $160,000 of the outstanding Ashuelot bonds. It did not appear that the prices paid by Elliot from time to time for these bonds were not as high as they could then be sold for in the market; but, in the course of his operations on behalf of the Cheshire Railroad, the price of Ashuelot bonds gradually rose until they became worth about ninety-five per cent. or more of their par value, that being about the market value of Cheshire bonds.

The dividends paid by Elliot on Ashuelot bonds since he took possession have been as follows: 1863, 1864, and 1865, three per cent.

each; 1866, 1867, 1868, 1869, 1870, and 1871, five per cent. each; 1872, four per cent. (1873, not yet made.) The question whether Elliot is entitled to retain the profits of these transactions, or must account to the corporation for them, is reserved for the determination of the whole court. The question to what extent, if at all, Elliot in making said purchases used trust funds, and whether he declared smaller dividends to the bondholders than he had the means of doing, or otherwise mismanaged the trust property for the purpose of depreciating the price of said bonds in order to buy them at a greater discount, depending largely on the state of his accounts and the amount of trust funds held by him at the several times of making said purchases and of declaring said dividends, is not now determined by me, but is referred to the master, under instructions to be given him at the law term, so far as, according to the opinion of the whole court, those questions become material.

In the fall of 1860 said Elliot held $40,000 in bonds of the state of Missouri, which he had purchased for about $32,000 with funds of the corporation. In dividing among the stockholders thirty dollars per share, according to the vote of October 9, 1860, it became necessary for him to make use of funds of his own, or sell a considerable part of the Missouri bonds. He advanced funds of his own, and kept the bonds; but it did not appear that he made any entry on any book to indicate that he did or did not then assume the bonds as his own property, nor that they depreciated in value below the sum he paid for them, until after nearly all of said advances were made to stockholders,— but it did appear that during the rebellion they depreciated largely; and I find that while they were thus depreciated it was the purpose of said Elliot to treat these bonds as the property of the corporation, and this purpose was declared to the bondholders in a printed circular, issued in January, 1864;—and I therefore find that, at the time when he subsequently sold them, he held them as the property of the corporation; that he is bound to account for any profits he may have derived therefrom, and that the master should take an account of the purchases and sales of said bonds, and of the income from time to time received thereon.

The Ashuelot Railroad has been run by the Cheshire Railroad Co. ever since January 1, 1861. On January 11, 1861, the Ashuelot corporation, at an adjourned meeting, authorized the president, treasurer, and one director to lease its railroad to the Cheshire Railroad Co. for nine months, at forty per cent. of the gross earnings, and thereafter till January, 1865, at $12,000 per annum; and a lease was soon afterwards duly executed, to take effect from January 1, 1861, for nine months, with liberty to the lessees upon the termination of the lease to revive it, and to keep it in force till January 1, 1865, at $12,000 per annum. On July 1, 1861, said Elliot, as trustee, contracted with the lessees for continuing the lease from October 1, 1861, till January 1, 1865, on the terms that the lessees should have the first $12,000 of the gross earnings, then the lessors $6,000, and the excess to be divided

equally. On October 1, 1861, it was provided between Elliot as trustee and the lessees that the contract should continue in force until it should be terminated by a notice from either party to the other with this modification, that the gross earnings should be appropriated as follows: viz., first, $12,000 to the lessees; second, $6,000 to the trustee; third, to the payment of taxes and contingent charges; fourth, to an equal dividend of the remainder. This contract continued in force till January 1, 1868, when a new one was entered into for one year, and until one of the parties should notify the other, in writing, of an intent to terminate it at the end of a year, at least three months before the end of such year, providing for the running of the Ashuelot Railroad by the Cheshire Railroad Co., upon the terms that the trustee should be entitled to the surplus after paying expenses at the close of each year; and this contract has remained in force ever since.

Elliot was chosen a director of the Cheshire Railroad in 1862, then and ever since owning one hundred shares of the capital stock thereof, and has been annually reëlected since, and has during all that time acted as such director. The plaintiffs claimed at the trial that the contracts between the trustee and the Cheshire Railroad were collusive and fraudulent, and that the trustee was incapacitated to make them; but I find that no such collusion or fraud was proved, but that the trustee as well as the Cheshire Railroad acted in good faith in making said contracts, and that said contracts were and are valid, unless it shall be otherwise determined by the whole court by reason of the incapacity of the trustee to contract with the Cheshire Railroad, of which he was a director and large stockholder. It did not appear that the accounts between the trustee and the Cheshire Railroad have been settled in accordance with said several contracts, although payments have from time to time been made thereon; and all questions in relation to the settlement of said accounts are referred to the master, with instructions to require the Cheshire Railroad to account for all sums remaining in its hands, in accordance with the terms of said contracts.

The officers of the Ashuelot Railroad, at the time it ceased to hold meetings or do business, were,—John H. Fuller, president and director; William Haile, John Stratton, William W. Thayer, David Ball, James B. Elliot, and Francis A. Faulkner, directors; and John H. Elliot, clerk and treasurer. John H. Fuller and John Stratton died previous to 1872; William Haile, James B. Elliot, and Francis A. Faulkner are now living. Whether William W. Thayer and David Ball are living did not appear. No one of these directors has held any stock in the Ashuelot Co. since about 1862; but Haile and Faulkner have during the whole time remained bondholders. It did not appear that any one of said directors has claimed to act in that capacity for many years, nor asked said John H. Elliot to render an account, nor called in question any of his acts as treasurer or trustee, nor that any stockholder or bondholder asked him to render an account or called in question any of his acts as treasurer or trustee, until some time in 1872, nor that

Elliot made any report whatever to the Ashuelot stockholders after January, 1861, nor any to the bondholders except a brief printed statement in January, 1864.

It appeared that, from about the time the railroad went into the possession of the trustee, the directors did not consider the property worth redeeming from the bondholders, and did not expect it ever would be redeemed, and considered their duties as officers of the company ended. I do not find that there was any collusion between them and said John H. Elliot to deliver the possession to him, or allow him to retain possession with any view to give him or the bondholders an unjust advantage.

The books and papers of the Ashuelot Railroad Co., now in the possession of the clerk of the court, are to remain in his possession during the pendency of this suit, unless it shall be otherwise ordered by the court or some justice thereof. Upon its termination, all books and papers belonging respectively to the custody of the clerk and treasurer of the corporation are to be delivered respectively to the clerk and treasurer for the time being.

The question how the rights of the parties may be affected by the laches of the corporation and of the stockholders in the matter of redeeming or calling for an account, all questions arising upon the mortgage hereto annexed, and all other questions of law, fact, or discretion which may arise on the foregoing case, were reserved for the determination of the whole court.

### COPY OF MORTGAGE.

WHEREAS, the Ashuelot Railroad Company, a corporation duly established by law, by it vote, passed the second day of January, Anno Domini one thousand eight hundred and fifty, authorized its president and three of its directors to execute a mortgage of the estate of said company, to secure the payment of the bonds and interest to the holders thereof to an amount not exceeding the sum of two hundred thousand dollars:

Now, therefore, be it known by these presents, that the said Ashuelot Railroad Company, for and in consideration of securing the full and final payment of the principal and interest of said bonds, and for the sum of one dollar to said company, paid by John Henry Elliot, clerk of said Ashuelot Railroad Company, of Keene, in the county of Cheshire and state of New Hampshire, the receipt whereof is hereby acknowledged, have granted, bargained, sold, and by these presents do give, grant, bargain, sell, and convey unto the said John Henry Elliot, and in case of his death to Charles S. Faulkner, of said Keene, and in case of his death to Asahel H. Bennett, of Winchester, in said county, the Ashuelot Railroad, commencing at the south line of the state of New Hampshire, in the town of Hinsdale and county of Cheshire aforesaid, and running northwardly to the Cheshire Railroad, near its depot in Keene, in said county, and as laid out and established by the railroad commissioners for said state, together with the franchise, lands, build-

ings, privileges, and appurtenances thereto belonging or that may here-after belong thereto, that are or shall be necessary for the occupancy and use of said road.

To have and to hold the said premises and property hereby granted, or intended so to be, to the said John Henry Elliot, clerk of said Ashuelot Railroad Company, and in case of his decease to said Charles F. Faulkner, and in consideration of his decease to said Asahel H. Bennett, in trust for the purposes and upon the conditions following, to wit: If the said Ashuelot Railroad Company, their successors or assigns, shall well and truly pay or cause to be paid their bonds to the amount of two hundred thousand dollars, and the interest thereon, which bonds shall bear date on or before the first day of January, A. D. one thousand eight hundred and fifty-one, and made payable in ten years from the first day of January, with six per cent. interest, to be paid semi-annually, then this obligation to be void and of no effect; and if said company shall refuse or neglect to pay the principal and interest of said bonds, or any part thereof, according to their terms, then and in that case, and in no other, the said mortgagees, or any individual or individuals holding said bonds, and being the owner thereof, may enter upon said described property hereby conveyed, and take possession of the same for the purpose of foreclosing said mortgage, reserving, however, to the mortgagors all the rights and privileges of redeeming said property provided by the laws of the state of New Hampshire.

In witness whereof said company have caused this deed to be attested in their behalf by their president and three of their directors, and their corporate seal to be hereunto affixed, at their office, in Keene, this first day of January, Anno Domini one thousand eight hundred and fifty-one.

Duly executed and recorded.

The cause was very fully and ably argued by *Lane* for the plaintiffs, and *Cushing* (with whom was *Hardy*) for the defendant Elliot. The arguments were, however, necessarily so much occupied with questions of fact and matters of no special value beyond the present case, that they are omitted. The following opinion of the supreme judicial court was delivered at the August adjourned term, 1874, by—

LADD, J. We think the conclusions of the judge at the trial, as stated in the printed case, with respect to the right of the Ashuelot Railroad corporation to redeem the mortgaged property, the appointment of a master to take an account, and the instructions to the master there suggested, are right, and that an order should be entered accordingly.

The defendants make two objections to the right of the corporation to redeem: (1) that they have permitted the matter to sleep so long that their present claim is stale; and (2) that the reorganization of the corporation by the election of officers at the meeting of August

17, 1872, was invalid for the reason that the magistrate who called the meeting was disqualified by the fact that he was a stockholder at the time. Neither of these objections can, in our judgment, be sustained.

Mr. Elliot had been in possession of the road as trustee since about January 1, 1861—a little more than eleven and a half years. There can be no pretence that any rights at law against the corporation had been gained either by him or by the bondholders by virtue of the statute of limitations; the time was not sufficient, even if the holding and management of the road by him had been such as to give the plaintiffs clear notice of an unequivocal renunciation of the trust. Nor have we been able to discover anything in the facts stated, which would justify the court in denying the plaintiffs the relief they ask, by an application of any known doctrine of equity respecting state demands. So far as regards the rights of the plaintiffs to redeem, the situation of affairs since January 1, 1861, is simply that their road and property have been in the hands of the mortgagee. No reason is seen why their rights to an account and to redeem should be lost by the lapse of eleven or twelve years, any more than the right of a mortgagor of any other property to redeem and to an account of the rents and profits should be lost by permitting the mortgagee to hold possession for the same length of time. The rents and profits in one case, as well as in the other, may in time be sufficient to pay off the whole mortgage debt; and it would be a singular consequence if the mortgagor is to be deprived of all benefit of such payment, and, in addition, be despoiled of his rights in the mortgaged property itself, merely because both parties have been content the one to pay and the other to receive payment on his debt in that way for a series of years less than the period of limitation fixed by law.

As to the disqualification of Mr. Lane to call the meeting of August 17, 1872, if it were admitted that he was disqualified, and that the doings of the meeting were thereby rendered void, it would seem to follow that the Ashuelot Railroad Co. is improperly made a party plaintiff to the bill. What would be the technical effect of such a holding upon the present proceeding we need not inquire, because we think the plaintiffs are right in their view that the act of the magistrate in calling the meeting was simply ministerial, and that the doings of the meeting were not thereby rendered invalid.

Upon these two points the court, after careful examination, are, as suggested, with the plaintiffs; and the reasons, most of which have been elaborately considered by counsel in their briefs, need not be enlarged upon. If the act of Lane in refusing the votes offered by Elliot was unauthorized and illegal, any person aggrieved had a plain and sufficient remedy by *quo warranto* or *mandamus*. Besides, the court found (and we are unable to doubt the correctness of the finding on this point) that the votes were properly rejected, because the shares upon which they were offered had been previously extinguished by the act of the corporation in buying them in; so that no wrong was in fact done, even had Lane been disqualified to rule upon the question

when the votes were offered. But the only act which Lane did, in his official capacity as justice of the peace, by virtue of the statute, was to call the meeting. Gen. Stats., ch. 133, secs. 15, 16. After the meeting assembled, in pursuance of the call, it was necessary in order to commence proceedings that some one should assume the duties of the chair. No one not a stockholder was entitled to be present or take part in the meeting. Certainly, then, a stockholder must act as temporary as well as permanent chairman of the meeting, and no reason can be conceived .why Mr. Lane, being a stockholder, might not do so as well as any one else. The rulings of the chairman, of which the defendant complained, and which, if wrong, furnished the basis of a proceeding to have the matter set right, were not made by virtue of any authority derived from the statute by Lane as a justice of the peace, but by virtue of his election by the stockholders to preside in the meeting. His functions as a public officer ended with the calling of the meeting. After it assembled he stood the same as other stockholders, and might vote and be voted for in the same way.

The defendants object to the finding that the transaction with Levi Chamberlain, in reference to the $1,000 bond, was a breach of trust on the part of Elliot. We are unable to doubt that the finding was right, and that Elliot must be held to account accordingly. It is true he had not at that time taken possession of the road as trustee under the mortgage ; but he was treasurer and clerk of the corporation, and we think it is very clear he had no right to make use of his official position, by any such device as this, to transfer to himself funds belonging to the company he was bound to serve. His counsel have argued that the transaction was strictly legal,—that is, that he did not go beyond his strict legal right in the matter,—and therefore cannot justly be held to account. Suppose he had accomplished exactly the same result without making use of Mr. Chamberlain or his name at all : how would it be then ? He was treasurer of the corporation, and in that capacity had charge of their bonds. He was at the same time owner in his private capacity of stock in the corporation worth $200 on $1,000 less than the bonds : would it be argued that he could directly appropriate to himself a $1,000 bond of the corporation, and in place of it substitute $1,000 of his own stock worth $200 less ? How does the indirect and circuitous route he took to reach the same result help the matter ? In any view suggested to us by the case, or by counsel in argument, we cannot but regard this transaction as entirely indefensible, and are unable to doubt that Elliot should restore to the corporation what he took from it in this way, just as much as though it had been taken directly, without any such attempt to give it color of right. The direction to the master, suggested in the printed case, as to the other $1,000 bond to Samuel Towns, stands the same, and is approved.

Upon the facts stated in the printed case with respect to Elliot's dealings in the bonds of the Ashuelot Railroad Company after he took possession of the road as trustee, no reason is now seen why he should not account to the corporation for the profits of those transactions.

We think it is impossible to sustain the view of his counsel, that his relation to the corporation after he took possession under the mortgage was not that of a trustee. Undoubtedly he represented the bondholders in respect of their rights and interests by virtue of the mortgage, but we think it equally clear that he represented the corporation in respect of their rights and interests in the mortgaged property. All his title, and all his right to possess and manage the property, was a trust. As to the mortgage debt, the real mortgagees, that is, the bondholders, were his *cestuis que trust*; as to the property itself and the equity of redemption, the mortgagors, that is, the corporation, were his *cestuis que trust*. The bonds formed the whole basis of this trust. With their extinguishment his legal title, and his consequent legal right to the possession of the road, would be gone. His general duty to the corporation lay in the direction of their extinguishment. It is not impossible but his private interest might in some contingency lie in the opposite direction. At all events, from what now appears, it is plain enough, we think, that he could not speculate in those bonds for his own private gain without violating very fundamental principles established for the government of those sustaining this fiduciary relation to others, and approved by courts of equity from the earliest times. The master may, however, be directed to report specially the facts respecting those transactions, and the final order in relation thereto may be delayed until the coming in of the report. The instructions to the master on this point, found in the printed case, are approved and adopted.

The court lay down no rule at this time as to the computation of interest, but leave that matter to be determined by the master, subject to reëxamination by the court upon the coming in of the report.

No question as to the good faith of the Cheshire Railroad in making or carrying out the contracts with Elliot is to be regarded as open to inquiry before the master in any way to affect the rights of that corporation. A master is to be appointed, who is to act under instructions drawn in accordance with these general views.

George A. Ramsdell, Esq., of Nashua, was afterwards appointed master, to take the accounts ordered, and the following instructions issued to him: In the hearing you will be governed by the opinion of the court announced at this term, as explained and supplemented by the printed case transferred at the January adjourned term, 1874. Copies of both said documents are hereto annexed for your information and guidance.

As to interest, you will make a computation and report results, upon such basis as to rests, &c., as in your judgment ought to be adopted; but you may report specially any facts relating to that matter, which either party desires reported, for the purpose of having the opinion of the court thereon.

As to contracts between the defendant Elliot and the Cheshire Railroad, and the operation and management of the Ashuelot Railroad under them, they may be the subject of investigation and report so far

as they may bear upon a just settlement by Elliot of the affairs of his trust with the plaintiffs.

It is the intention of the court to make these instructions so general that a full hearing may be had upon the merits of all matters in controversy which have not already been determined by the court ; and to this end you may hear the parties and report specially to the court any fact not already determined, which either party desires, and which in your judgment may be material.

At the March adjourned term, 1874, the master returned a very full and carefully considered report upon all the matters submitted to him, the concluding portion of which is as follows :

### " ELLIOT'S TRANSACTIONS IN ASHUELOT BONDS.

" I find that at the time Elliot took possession of the Ashuelot Railroad as trustee, he was the owner of its bonds to the amount of $24,000. From 1861 to 1867 (or the time he commenced to exchange Ashuelot bonds for Cheshire bonds) he purchased Ashuelot bonds to the amount of $46,000, for which he paid the market price of the bonds from time to time. For some he paid fifty per cent. of the par value, for some sixty-two and a half, and for some seventy-five per cent.

" As to the amount paid by Elliot for the $46,000 Ashuelot bonds, the evidence before the master was limited. The trustee testified that he had no means of showing the amount he paid for these bonds ; that he paid from fifty cents on the dollar upward. In the absence of satisfactory evidence, I find that these bonds cost Elliot, upon the average, sixty-two and a half cents on the dollar, and that he exchanged these, together with the $24,000 before mentioned, for Cheshire Railroad bonds, which he afterwards sold for ninety-three cents on the dollar, or about that price. The $30,000 bonds which, with Elliot's $70,000, went to make up the first $100,000 which the Cheshire Railroad owned, were procured by Elliot under his agreement with the Cheshire Railroad.

" Elliot purchased a portion of these bonds and exchanged them for Cheshire bonds, and some parties directly exchanged Ashuelot bonds for Cheshire bonds. Elliot testified, and he was not contradicted, that he made no profit on the $30,000 bonds so obtained. I therefore find that Elliot made no profit on this part of the $100,000 bonds obtained for Cheshire Railroad.

" As to all bonds now held by the Cheshire road above $100,000, I find that Elliot acted as the agent of the Cheshire Railroad in procuring them, with the exception of the last $10,000 ; that these bonds so procured were obtained by direct exchange of Cheshire bonds for Ashuelot bonds, and that Elliot made nothing by the transaction."

As bearing on the question of the liability of Elliot, growing out of his transactions in Ashuelot bonds while he was treasurer and trustee, the master reports the following general findings :

" 1. I find that the bonds purchased by Elliot, before he took possession of the road as trustee, were bought with his own money.

" 2. I find that, at the time he so took possession of the road, the funds which I have heretofore found in his hands as treasurer were invested in Missouri bonds, and remained so invested for several years, and that his action in so investing the funds of the company, although lacking legal authority, was not accompanied with bad faith as a matter of fact.

" 3. I find that when Elliot took possession of the road as trustee, or soon after, he understood that the stock of the Ashuelot Railroad was substantially extinguished, and that the real capital of the road was represented by its bonds, and that he was acting as the executive officer of this new organization which he supposed to exist.

" 4. I find that Elliot had funds of the Ashuelot Railroad in his hands to some extent while he was purchasing bonds for himself and the Cheshire Railroad, and that some of these funds may have been used by him in the purchase of bonds. I also find that his accounts as treasurer and trustee have not been settled, nor his compensation for services in either of these offices adjusted, during the twenty-five years preceding this hearing.

" His claim for services, which was much larger than I have allowed (and based upon an agreement with the president of the road, according to Elliot's testimony), would show, if admitted, much less money of the company in his hands from time to time than appears by the foregoing exhibit.

" The evidence also showed Elliot to be possessed of ample means and credit to carry through any enterprise in the way of bond purchases he was shown to have been engaged in, without the aid of the Ashuelot Railroad funds. I therefore find that so far as he used the funds of the Ashuelot Railroad in the purchase of bonds (the exact amount of which, on the evidence submitted, I cannot state), he so used the funds without any intention to defraud the Ashuelot road.

" 5. I find that Elliot did not declare smaller dividends to the bondholders than he had the means of doing, or mismanage the trust property for the purpose of depreciating the price of the bonds so that he could buy them at a greater discount.

" 6. I find that by reason, in part, of the action of Elliot in buying up and concentrating so many of the Ashuelot bonds in the hands of the Cheshire Railroad, while he was trustee of the first road and director in the latter, the Ashuelot bonds have risen in the market from fifty per cent. of par value to par value, or nearly par value, and that the Ashuelot Railroad is prejudiced by this action, the extent of which it is impossible to state, upon the evidence submitted to the master, and perhaps upon any evidence in existence.

" 7. I find that the Cheshire Railroad, if it becomes material, is chargeable with full knowledge of the fact that Elliot was treasurer or trustee of the Ashuelot Railroad from January 1, 1861, to the present time.

"BONDS HELD BY CHESHIRE RAILROAD.

"The Cheshire Railroad now owns $160,000 of the whole amount of bonds of the Ashuelot Railroad outstanding. William Haile is supposed to be the owner of $12,500, F. A. Faulkner of $4,000, and other persons, whose names were given to the master, of bonds to the amount of $10,500. As to the whereabouts of bonds to the amount of $3,000 nothing seems to be known. This amount may never be presented. At the request of the Cheshire Railroad, I find that there is due on the bonds held by said railroad (a copy of bond is hereto annexed), computing interest with semi-annual rests, and deducting the payments of interest by the trustee from time to time as the payments were made on the first day of January, 1875,

| | |
|---|---|
| Principal, | $160,000.00 |
| Interest (less dividends paid), | 100,391.69 |
| Total amount due January 1, 1875, | $260,391.69 |

ANOTHER STATEMENT MADE BY THE MASTER.

| | | |
|---|---|---|
| Bonds, | | $160,000.00 |
| Simple interest 14 years, | | 134,400.00 |
| | | $294,400.00 |
| Amount of dividends paid on these bonds from 1861 to 1875, | $68,800 | |
| Simple interest on these dividends from time of payment to January 1, 1875, | 28,992 | 97,792.00 |
| Total amount due January 1, 1875, | | $196,608.00 |

THIRD STATEMENT, MADE AT REQUEST OF ASHUELOT RAILRORD.

| | | |
|---|---|---|
| Bonds, | | $160,000.00 |
| Simple interest on same from time of purchase by Cheshire Railroad, | | 56,101.52 |
| | | $216,101.52 |
| Dividends received by Cheshire Railroad, | $24,850.00 | |
| Simple interest on dividends received, | 6,469.73 | 31,310.73 |
| Amount due January 1, 1875, | | $184,781.79 |

"At the request of the Cheshire Railroad, I report to the court that subsequent to taking the lease of the land in the Y, the Cheshire Railroad Co., relying upon the validity of the lease, proceeded to erect thereon an engine-house, and other permanent brick structures, at a large expense; that the Cheshire Railroad will suffer great loss by reason of the occupation of this leased land in this manner, unless the court can in some way protect the lessees.

"The Cheshire Railroad claimed before the master, and offered to

prove, that the sums I have found as paid to the trustee, from 1861 to 1868, were the amounts justly due for that time from the Cheshire Railroad to the Ashuelot Railroad; that there was no contract or lease in force from 1864 to 1868; that the accounts between the roads for the years 1861, 1862, and 1863 were settled by the trustee and the directors of the Cheshire Railroad; that no settlement was made after 1863 until the making of the contract in 1868, because the parties were not agreed as to the terms upon which the road should be run; that at the time of the making of the contract of 1868 it was agreed by the Cheshire Railroad and the trustee that the settlement for 1864, 1865, 1866, and 1867 should be made upon the basis of the contract of 1868.

" The Cheshire Railroad also claimed, and offered to prove, that Mr. Justice Hibbard did not inquire into the fact of the existence of the leases or contracts as found to exist by him on page five of his case, and that the master should consider the question open whether or not such leases or contracts did exist as a matter of fact.

"The Ashuelot Railroad claimed, and offered to prove, that these matters were inquired into at length by Mr. Justice Hibbard; that he found the fact of the existence of certain definite leases and contracts between the Cheshire Railroad and the trustee covering all the time from 1861 to the time of the hearing; and the further fact, that, although payments have been made from time to time by the Cheshire Railroad to the trustee, no settlement in accordance with the leases or contracts had been made.

" The master, being of the opinion that Mr. Justice Hibbard had found on the fifth page of his case substantially as claimed by the Ashuelot Railroad, declined to go into the question whether or not any particular lease or contract was in force at any particular time, and, at the request of the Cheshire Railroad, reports this ruling for the consideration of the court."

The material part of the Ashuelot bonds is as follows: " Be it known by these presents, that the Ashuelot Railroad Company, for value received, acknowledges itself indebted to A. Boody & Co. in the sum of five hundred dollars, which sum it hereby promises to pay to the said Boody & Co., or bearer, at the office of its treasurer, on the first day of January, in the year of our Lord one thousand eight hundred and sixty-one, with interest at the rate of six per cent. per annum, payable half yearly at said treasurer's office, on the first days of July and January of each year after the first day of January of the year eighteen hundred and fifty-one, upon the surrender of the corresponding warrants hereto annexed."

Upon the coming in of the master's report, the Cheshire Railroad moved that the same be recommitted, for a purpose which fully appears from the opinion below. A large amount of testimony was taken, and the motion was argued by *Sargent* for the Cheshire Railroad, and *Lane* for the plaintiffs.

At the December term, 1875, the following opinion of the whole court was delivered by

LADD, J.   The Cheshire Railroad Co. moved that the master's report be recommitted, with instructions to inquire under what contract or upon what terms the Ashuelot Railroad was run by the Cheshire Railroad during the years 1864, 1865, 1866, 1867, and to revise his statement of the account between the two roads for those years.  Quite a large amount of evidence has been laid before us bearing upon this application, consisting mainly of statements by counsel of what occurred at the hearing before Mr. Justice HIBBARD in January, 1874, it being claimed upon one side that the question whether the road was run during those years under the original lease, as modified by the three memoranda found indorsed upon it, signed only by Mr. Elliot, was fully discussed and considered at that hearing, and on the other, that that question was only incidentally raised, if at all, and was understood to be left open to be determined by the master.

It appears that the hearing before Judge HIBBARD occupied some four days or more; that the Cheshire Railroad was represented by very able counsel; that a considerable amount of evidence was introduced on their behalf, and that their views and claims were urged upon the court at the final argument by counsel specially employed to look after their rights and interests in the hearing.

It is not in dispute that the plaintiffs claimed in their bill, and claimed at the hearing, that the Cheshire Railroad was liable to them, and should render an account to them upon some basis or other, for the use of the Ashuelot Railroad during the whole period the latter railroad was in the possession and occupation of the former.   The plaintiffs claimed fraud,—that is, that the Cheshire Railroad, acting in collusion with Mr. Elliot, obtained the possession and continued in the possession of the Ashuelot Railroad, upon terms that were unjust and unfair, discriminating greatly in favor of the Cheshire and against the Ashuelot road.   One great question was, whether the Cheshire Railroad should be held to account at all to the plaintiffs; another (in case they were held to be thus liable) must have been, the basis upon which the account should be taken.

The very cautious and painstaking judge who tried the cause made a report of certain facts found by him upon the evidence, referring several questions of law to the full bench for determination, and recommending (in case those questions should be determined in the way they afterwards were) the appointment of a master to state the accounts upon the basis of the facts found and reported by him at the trial.   Upon the question of fraud, his finding was adverse to the plaintiffs.   He says,—" The plaintiffs claimed at the trial that the contracts between the trustee and the Cheshire Railroad were collusive and fraudulent;    *    *    *    but I find that no such collusion or fraud was proved."   He also found that " On October 1, 1864, it was provided between Elliot as trustee, and the lessees, that the contract should continue in force until it should be terminated by a notice from either party to the other, with this modification [which he states].   This contract continued in force till January 1, 1868, when a new one

was entered into for one year," &c. And his conclusion, embodying directions to the master as to taking the account, is stated in terms so clear and explicit as scarcely to leave room for doubt that he must have understood the question he was thus deciding to be, so far as concerned the Cheshire Railroad, the main question in the case. He says,— "It did not appear that the accounts between the trustee and the Cheshire Railroad have been settled in accordance with said several contracts, although payments have from time to time been made thereon ; and all questions in relation to the settlement of said accounts are referred to the master, with instructions to require the Cheshire Railroad to account for all sums remaining in its hands, in accordance with the terms of said contract."

Some time after this report was printed and distributed to the court and counsel, an application was made on behalf of the Cheshire Railroad to Judge HIBBARD to amend it, by stating, in effect, that the memorandum of October 1, 1864, not having upon it the signature of the Cheshire Railroad, was simply a proposition by the trustee not accepted by the railroad. It appears that, after consideration and an examination of his minutes of the trial, Judge HIBBARD refused to make such an amendment. In his letter to counsel for both sides, of June 14, 1874, he says,—" Mr. Wheeler's amendment, to the effect that the agreement of October 1, 1864, was only a proposition not accepted by the Cheshire Railroad, is not borne out by my recollection or minutes."

It does not appear that any application for a rehearing upon this point was made to the court either at the June term or the August adjourned term, when the questions of law were settled and a master appointed, nor at the December term following ; but at the hearing before the master, the Cheshire Railroad offered to prove that from 1864 to 1868 there was no lease in force, &c., thus raising questions which, it is admitted, the master could not go into without disregarding the unequivocal terms of his instructions from the court. Upon the coming in of the master's report, at the March adjourned term, 1875, this application for a rehearing was, so far as I am aware, for the first time made to the court.

I have carefully examined all the papers in the case from the beginning—all the evidence and arguments of counsel—and my conclusion is, that the motion ought not to be granted.

In the first place, it seems to me impossible for any one who knows Judge HIBBARD to doubt that he did examine and consider the question with scrupulous care before he undertook to decide it as he did. That he must have understood the importance of the decision is clearly shown by the report, because he says that the accounts had not been settled in accordance with the contracts ;—and even if through inadvertence he had found so important a fact without a proper hearing, it is inconceivable that, when his attention was called to the matter, as it was by counsel in June, he should have refused the proposed amendment without himself suggesting a further hearing. The inference is

very strong, to say the least, that he must have understood that the question was fully and sufficiently tried by him in January before.

Again : there are pretty strong probabilities, as it seems to me, pointing the same way. There is some evidence that it was claimed at the trial that the Cheshire Railroad should not be held to any accounting in this proceeding, but that the bill as to them should be dismissed. But however that may be, it would seem to be morally certain that counsel, of the experience and sagacity of those who represented that corporation, must have foreseen that such accounting might be ordered. If that were done, then the question would be, Upon what basis should the account be taken ? Should the contracts be all thrown aside on the ground of fraud, or on the ground that Mr. Elliot, as trustee in possession of the Ashuelot Railroad, could not contract with himself as a stockholder and director in the Cheshire Railroad, and the account be taken on the basis that the Cheshire Railroad had been for a long time operating and taking the profits of the Ashuelot Railroad without right, and in their own wrong? or should it be taken on the basis of some contract or contracts ? If in the latter way, what were the contracts that should govern ? These were clearly the great questions, so far as the Cheshire Railroad was concerned, at the trial ; and how they could have escaped the vigilance of counsel is hardly less difficult to imagine than it is to believe that the court decided them without a hearing.

It is certain that the lease of January 1, 1861, with the memorandum of October 1, 1864, written upon it by Mr. Elliot, and signed by him, was introduced in evidence, and was before the court when the decision was made. It is certain that this lease, with that memorandum upon it, was in the hands of the Cheshire Railroad during the years when it is claimed no contract was in force. It is certain that the Cheshire Railroad, having in their hands the lease and memorandum, continued to possess and operate the Ashuelot Railroad the same as before. These facts, at least, must have appeared at the trial, and it cannot be denied that they furnished some evidence upon which the finding of the court, as to the contract under which the business was done from 1864 to 1868, might legally be based.

Mr. Wheeler, in his statement, says,—" The claims of the plaintiffs were, in substance, as I recollect them, that the Ashuelot road had been rented to the Cheshire road for a much less sum than it was worth, through the bad faith of the trustee and the connivance and aid of the directors of the Cheshire road ; that there was fraud and collusion between those parties, by which the Ashuelot road had been wronged and deprived of its just income and fair earnings." All the evidence shows that this claim was made and strongly urged by the plaintiffs at the hearing. It is obvious that in no way could such a claim be more effectually met and answered than by showing the existence of a fair and equitable contract, whereby the trustee was to be paid a just and reasonable compensation for the use of the Ashuelot road. It cannot be said that the memorandum of October 1, 1864, was introduced by the Cheshire Railroad for that purpose. There is,

indeed, evidence that Mr. Wheeler objected to its admission, on the ground that it was not signed by his clients. It was however admitted, and its bearing on the question of fraud is so obvious and direct as to afford a strong presumption that it must have had great weight in the mind of the judge in determining that question as he did.

I do not consider it necessary to comment at length upon the evidence. It need not be said that it all comes from sources quite above the suspicion of any intentional misrepresentation; and the discrepancies of recollection which appear in it are no greater than might be expected from gentlemen actively engaged, as most of these witnesses were, in conducting the trial, and who could not avoid looking upon what transpired through the atmosphere of their personal or professional interest. I must say, however, that the impression which the evidence, as a whole, leaves upon my mind, is the same as that already stated arising from a view of the situation of the case, and the probabilities therefrom arising as to what was done.

I think it must be regarded as established by the evidence, that the statement marked "A," made up by Mr. Stuart from the books in his custody, was introduced at the trial by the Cheshire Railroad as an exhibit of their claim respecting the state of their account with the trustee, in case that matter should be gone into; and I think the fair balance of evidence is, that this statement was claimed to derive its force and validity from the adjustment concluded between Mr. Edwards and Mr. Elliot in the autumn of 1868.

Now these claims were directly contradictory to the position that the accounting should be according to the memorandum of October 1, 1864; and if the basis upon which that accounting should be made was not under consideration, and the question whether the memorandum of October 1, 1864, was in force for the four years following was not distinctly and clearly before the court, it is not easy to understand why such evidence was introduced, and such claims made on behalf of the Cheshire road.

I think it must also be taken as proved, that Mr. Stuart was inquired of and testified as to whether an account of the expense of running the Ashuelot road was kept prior to 1868; and this has a tendency, more or less direct, to show that the question whether the parties understood that they were acting under the lease and memoranda during that time was raised and considered.

Considering these things together,—namely, the fact that the court distinctly found and reported that the Ashuelot road was operated by the Cheshire road during the years 1864, '65, '66, and '67, under the lease and memorandum; the fact, that the question how it was operated was manifestly the vital question, in case the Cheshire Railroad should be held to account; and the further fact, that evidence was introduced at the hearing bearing both ways on that question,—I am unable to hesitate in coming to the conclusion that the question was tried and intelligently passed upon by the court at the hearing in January, 1874.

Has it been made to appear that a rehearing of this point, either by the master or the court, would probably change the result, and that injustice will be done unless such rehearing be granted?

Mr. Murdock, the president of the Cheshire Railroad, says,—" Unless these matters can be opened, and the facts as to the leases, the terms they were in operation, and the adjustments between the Cheshire Railroad Co. and the trustee, great injustice will, in my judgment, be done to the Cheshire Railroad, and they will be subjected to heavy pecuniary loss, and that without an opportunity of being fully heard." Mr. Wheeler says that at the hearing before the master the Cheshire Railroad was prepared to prove, and offered to prove, certain facts with respect to the leases and operation of the road, and the true state of accounts between the railroad and the trustee, which in his belief would have shown that the sum due the Ashuelot road or the trustee was less by many thousands of dollars than the sum found by the master.

In determining how much weight ought to be given to these general statements and expressions of opinion, I have found myself embarrassed by the fact that we have not been informed exactly what it is that the Cheshire Railroad claim. It is true, the claim in general terms is, that they should be held to account for what is justly and fairly due from them for the use of the road, and no more ; but I do not understand from the evidence that it is now claimed absolutely that the accounting should be on the basis of the adjustment of 1868,—that is, that the yearly expense of running the road for 1864 and 1865 should be called $24,000, and for 1866 and 1867, $30,000 ;—and whether it is claimed that there should be an estimate by the master or the court of the expense of running the road for those years, and the Cheshire road be held for what remains of the gross earnings after deducting such estimated expense, is not clear from the evidence.

The injustice which it is claimed has been done to the Cheshire Railroad by the finding of the court consists in the fact that there has been no full hearing as to the length of time the Ashuelot road was run under each agreement, when and how long it was run without any written agreement in force, &c. ; but I have not found in the evidence any specific statement of this claim in that behalf, and I think it may fairly be said that they rest now upon a general allegation that the amount found due by the master is much too large, and that the lease ought not to have been found to be in force for the years 1864, 1865, 1866, and 1867. It is certain that if this matter were to be opened at all, it must be fully opened, for the question whether the conduct of the parties amounted to a legal or actual fraud upon the rights of the Ashuelot Railroad, or the stockholders in that corporation, is manifestly so intimately connected with the question of whether the lease was in force, that palpable injustice would be done by allowing a partial inquiry to be gone into, or by allowing any inquiry under restrictions that would discriminate in favor of one party and against the other.

It seems to me that, looking at the whole matter so far as it appears before us at the present time, there are several things that tend

strongly to show that injustice has not in fact been done, and that a rehearing ought not materially to change the result.

I shall premise the few observations I have to make on this point by a remark which justice both to Mr. Elliot and the Cheshire Railroad may require,—and that is, that the moral complexion of their conduct may be, and probably is, much modified by the fact that they supposed the mortgage to be, in effect, foreclosed, so that Mr. Elliot owed no duties except to the holders of the bonds. How far that fact should be given weight in determining the *equitable* rights of the parties is another question. I suppose it cannot be contended that the *legal* rights of these plaintiffs are to be affected by that belief, which, in the event, turned out to be unfounded. Further than that we need not now inquire.

Guarding myself by this remark against misconstruction, I say that the fact that Mr. Elliot during all those years was a director in the Cheshire Railroad is to my mind one of grave significance, if not of controlling force. The plaintiffs do not now, as I understand it, claim that any contracts made after he became such director should be set aside for that cause ; otherwise I confess I do not see how they could be sustained. But here was a contract originally made, and modified in some particulars by two indorsements, before he became a director in the Cheshire road, and under which that corporation entered into possession of the Ashuelot road. That possession was continued after Elliot became a director, and the original contract remained all the time in the hands of the Cheshire road. The modification made by the memorandum of October 1, 1864, was slight. It was in favor of the Cheshire Railroad, and was made and signed by a director in that corporation. The lease was not cancelled nor given up, and the Cheshire road continued to control and use the Ashuelot the same after as before. Here is evidence, as it seems to me, of an understanding by the parties that the Ashuelot road should be run under the contract, quite too strong to be overcome by anything that has been laid before us in the evidence upon this application, or suggested in the very able arguments of counsel for the Cheshire Railroad.

When the original lease was executed, January 1, 1861, before Mr. Elliot became a director in the Cheshire Railroad, and before the act of the legislature to foreclose the mortgage, it was the judgment of the parties that the Cheshire Railroad might and should pay for the control and use of the Ashuelot forty per centum of its gross earnings ; and after an experiment of six months, and still before the election of Mr. Elliot as a director in the Cheshire road, or the passage of the bill to foreclose the mortgage, it was thought, as appears by the memorandum of July 1, 1861, that a suitable arrangement would be that the Cheshire road should take the first $12,000 of the gross earnings of the Ashuelot, the Ashuelot the next $6,000, and the overplus be divided equally between the two roads.

In 1861 the gross earnings of the road are reported to have been $17,080.54. In 1864 the gross earnings had a little more than doubled,

being $35,746.23. In 1865 they were $41,211.83. In 1866, $44,701.42. In 1867, $44,012.76. I suppose this increase of the gross earnings must be due mainly to an increase in the business of the road, and it is reasonable to conclude that an increase of the business would be attended with an increase of the expense; but in what proportion the one kept pace with the other we are not informed. The original lease provides for a service of two passenger trains daily each way, and it does not appear that that service has been increased. How much of the increase of the earnings came from passenger traffic and how much from freight, does not appear; nor does it appear how far an increase in the expenses, arising from an increase of the business of carrying goods, ought to be compensated by the increased receipts from that source. The details are not before us. But, without the details, it seems to me there is enough to raise a strong probability, to say the least, that the largely increased receipts of the Cheshire road from the use of the Ashuelot ought to have been, and were in fact, sufficient to cover all legitimate and necessary increase of expenditure called for by the increase of the business of the road. For example : if we take the year 1867 and compare it with the first year the road was run, under the memorandum of July 1, 1861, we find that in 1862 the Cheshire would receive according to the contract $12,000, and the trustee $6,000, leaving a balance of $328.54 to be equally divided, unless it were applied towards the payment of taxes, &c. In 1867 the Cheshire road received first $12,000, then one half of $26,012.76, being $13,006.38, making in the whole $25,006.38, or more than double what they could receive according to the terms of the contract in 1862, while the trustee would receive $19,006.38, less whatever sum was paid for taxes and contingent charges under the memorandum of October 1, 1864.

It is true, the statement marked "A" shows the expenses of running the road for the year 1867 to have been $33,092.50, or about three times the average expense for the first two years,—1861 and 1862,—thus making a net loss, according to that paper, of about $8,000 when the gross receipts were $44,000, while for the first year the road was run under the contract, when the gross receipts were considerably less than half as much, viz., $18,328.54, there was not only no loss, but apparently a gain of $328.54.

I think a fair observation upon these facts is, that, unless the Cheshire Railroad derived some compensating advantage from the control of the Ashuelot that does not appear in this balance sheet, it is improbable in a high degree that they would have gone along so many years, increasing their loss each year, without any definite understanding, and without cancelling a contract which they must have known it was within the power of the trustee to enforce against them. A further observation, which also seems to me just, is, that it is hard to reconcile the conduct of Mr. Elliot in making the arrangement or adjustment of 1868, as to the four preceding years, after things had been permitted to drift on in this way so long, with a jealous and disinterested care for the rights and interests of the Ashuelot road.

These are some of the considerations which have led me to the conclusion that the motion for a rehearing on this point should be denied.

SMITH, J., and * FOSTER, C. J., C. C., concurred.

Upon the question of the legal relation sustained by Mr. Elliot to the Ashuelot Railroad, and the respective rights and obligations of the parties arising therefrom, counsel were heard at length, both by oral and printed arguments.

Among a large number of authorities, *Lane*, for the plaintiffs, cited Perry on Trusts, sec. 217, 1 Story Eq., secs. 395, 533, *Page* v. *Page*, 8 N. H. 198, *Lyford* v. *Thurston*, 16 N. H. 408, *Hill* v. *McIntire*, 39 N. H. 416, *Martin* v. *Moulton*, 8 N. H. 504, Perry on Trusts, sec. 207, 1 L. C. Eq. 196, *Butts* v. *Wood*, 38 Barb. 188, *York & Midland Railway Co.* v. *Hudson*, 19 Eng. L. E. 365, *Scott* v. *Depeyster*, 1 Edw. Ch. 513, *Verplank* v. *Mercantile Ins. Co.*, 1 Edw. Ch. 85, *Great Luxemburg Railway Co.* v. *Magenay*, 25 Bev. 586, *E. & N. A. Ry. Co.* v. *Poor*, 59 Me. 277, *Benson* v. *Heathorn*, 1 Young & Cole, ch. 343, *Sawyer* v. *Hoag*, 17 Wall. 610, *St. James's Church* v. *The Church of the Redeemer*, 45 Barb. 356.

A board of directors cannot make a contract with one of their number, or with a copartnership in which one of their number is interested, that will bind the corporation. *Railway Co.* v. *Poor*, 39 Me. 277; *Coal Co.* v. *Sherman*, 30 Barb. 563; *Ogden* v. *Murray*, 39 N. Y. 202; *Bliss* v. *Matteson*, 45 Barb. 22; *Imperial Mercantile Credit Association* v. *Coleman*, L. R. 6, ch. 558. The *cestui que trust* alone may repudiate the trade and take its gains. *Jackson* v. *Van Dalfsen*, 5 John. 43, 48; *Jackson* v. *Walsh*, 14 *id.* 407, 415; *Wilson* v. *Troup*, 2 Cow. 196, 238; *Hawley* v. *Cramer*, 4 *id.* 719, 744; *Jennison* v. *Hapgood*, 7 Pick. 1; *Thorp* v. *Cullum*, 1 Gilman 615, 627; *Richardson* v. *Jones*, 3 Gill & John. 164, 184; Perry on Trusts, secs. 198, 846.

As to the rule to be applied in computing interest,—*Townsend* v. *Riley*, 46 N. H. 313; *Little* v. *Riley*, 43 N. H. 113; *Pierce* v. *Rowe*, 3 N. H. 179; *Craven* v. *Tickell*, 1 Ves. Jun. 63; *Arnott* v. *Redfern*, 3 Bing. 353; *Hummell* v. *Brown*, 24 Pa. St. 310; *Swamscott Machine Co.* v. *Partridge*, 25 N. H. 379, 380; *McIlvaine* v. *Watkins*, 12 N. H. 471, 481; Sedgw. on Dam. 462, 475; *Hamilton* v. *Van Rensselaer*, 43 N. Y. 244; *Ludwick* v. *Hunzinger*, 5 W. & Serg. 51, 60.

*Sargent & Chase* and *A. S. Waite*, for the defendant Elliot.

1. The master finds in the hands of Mr. Elliot, as treasurer, when his services as such closed on January 1, 1861, the sum of $10,451.50, leaving to the court to determine whether, as matter of law, he should be charged with any, and if any, what interest on that sum from that time, the master computing the interest in various ways to meet any

---

* CUSHING, C. J., having been of counsel, did not sit.

anticipated rule which the court may hold applicable to the case. The master finds that Elliot is not liable by reason of the transaction in regard to the Samuel Town's bond; and he finds, substantially, that he acted in good faith throughout.

No such dealings of Elliot, or state of affairs, is reported by the master, or was shown at the hearing, as to warrant the charging him with interest on this fund. He was simply the treasurer of the corporation, and his duty was, and was only, to keep its funds safely, which he did. This was all he was required to do, and he should be held for nothing more.

2. Is Mr. Elliot chargeable by reason of his dealings in the bonds of the Ashuelot Railroad Company? The facts upon which this question arises appear in the master's report. Of the $100,000 of bonds passed to the Cheshire Railroad, Elliot was himself in the beginning the owner of $24,000, and the Ashuelot Company was indebted to him personally to that amount. He has a right to be paid their full par amount by his debtor, and of course he had a right to sell them for what he could get. It was not, surely, a great speculation to part with his claim at seventy dollars on a thousand less than its amount. On $30,000 of these bonds he is found to have made nothing; on $46,000, Elliot realized a profit from the exchange of the difference between sixty-two and a half cents and ninety-three cents on the dollar. Is he chargeable for that to the Ashuelot Railroad Company?

In reasoning to a just conclusion upon this question, one fact must not, as we conceive, be lost sight of, but it must be regarded as a fundamental consideration throughout. It is, that the Ashuelot Railroad Company are debtors to this full amount upon these bonds, and had mortgaged their road to secure its full payment. They had obtained credit for that amount, and had received and were enjoying the full consideration in money, which had gone into their coffers. Considering the Ashuelot Railroad Company alone, it cannot have been injured, in any correct legal sense, by any transactions by anybody in the evidences of their indebtedness. They were not, and could not be, made liable to pay more than the amount they justly owed.

Were Mr. Elliot's relations to this corporation such that his transactions change or lessen their liability? For the claim here set up is, that they are entitled to redeem their property from the mortgage by paying a less sum than that which they have contracted to pay and for which the mortgage was given.

Now these bonds were issued in order that the company might obtain credit for their amount. By this means the company did obtain such credit, and Elliot was made the instrument by which that credit was obtained. The name of the office to which he was called clearly imports his relation and his duties to the parties respectively. He was "trustee for the mortgage bondholders." His relation to the bondholders was that of their agent, to protect their interests and their rights as creditors of the mortgagor; his relation to the Ashuelot Railroad Company was that of a creditor and mortgagee, and he owes no

duties to it except as such.   There was nothing inconsistent or incompatible in his being at the same time an owner of bonds in his own right, and trustee or agent for other bondowners: his relation to the corporation with respect to either, was that of creditor and mortgagee: his duty to those whom he represented was, to keep the bonds at par value if practicable—to counteract any influence or tendency to depreciate them ; and in doing so he did no wrong and violated no duty to his debtor.

Such were his relations and his duties up to the time when he took possession of the road.   In what respect did they become changed by that event ?   He became, then, a mortgagee in possession, and is doubtless to be regarded and treated as a trustee of his debtor in the same sense that any other mortgagee in possession is to be so treated. He is a trustee of the property of which he has thus acquired the possession, and must act with respect to it, not only in the utmost good faith, but is chargeable with any profits which may be realized by his dealings with it.   Such is unquestionably the well settled rule, and founded upon the best reasons of clear equity and sound public policy.   For all these profits the master has charged him, thus reaching the result that on January 1, 1875, including interest to the amount of $1,970, he is chargeable to the amount of $3,995 as rents and profits of the mortgaged property in his possession.

But, with respect to the indebtedness for which the property was mortgaged—that is, the bonds—what are his relations and his duties ? As to these, he is the representative of the creditors, and stands in their place, having the corporation for his debtor.   If he used the mortgaged property, or its proceeds, to purchase in the mortgage debt, it would thereby become extinguished to the extent of such purchase, and if he still kept the debt outstanding he would be chargeable.   He would in such case be chargeable, not because he made the purchase, but because, and only because, the purchase was made with a fund belonging to the debtor, and of which he was the trustee for them. But suppose he purchased only with his own funds, not having in possession any fund of the debtor which it was his duty thus to appropriate, as is the case at bar: are the debtors injured, or could they, from the nature of the case, by any possibility be injured thereby, in any legal sense ?   We submit that they could not.   The sum which they had contracted to pay, and for which a full consideration was received, is not thereby made greater, nor is the amount of their available property made less ;—neither in the present case was the credit of the debtors injured, but was, rather, made better, for the market price of the bonds was raised as a consequence.   What equities, then, have these debtors to urge why on this account they should redeem their mortgaged property short of paying the full amount of the mortgage debt ?

These bonds were put upon the market by the plaintiffs—for what ? Not that they might, by being sold below par, become depreciated in order that the indebtedness might be lessened, but in order that they

might obtain, and retain, credit for their full par amount. It was intended that they should pass from hand to hand as they could find purchasers, but always to be evidences of debt to their full amount. There was no incompatibility between the two positions of mortgagee for one part of the debt, and trustee or agent for other mortgagees of other parts ;—and being such trustee or agent could furnish no reason why Mr. Elliot, if he had any money to invest, might not invest it in these securities. This could by no possibility be any injury to the debtors, for it did not and could not enhance their liability. If the mortgaged property had been managed with a view to enable him to make such purchases at a low rate, the case would present a very different question ; but this the master has proved he did not do.

It has never been held that by the purchase of an indebtedness at a discount the debtor is thereby relieved from full payment at par. It has never been held that a creditor may not purchase in other claims against his debtor at a discount, or that, if he does, the discount is for the benefit of the debtor. It has never, so far as we are aware, been held that a mortgagee may not purchase at a discount other debts secured by mortgage upon the same property, and insist afterward upon payment at par. Nor has it been held that any difference is made in this respect by the mortgagee being in possession of the mortgaged property, so long as he neither uses that property nor makes use of such possession to effect the purchase.

The master finds " that Elliot did not declare smaller dividends to the bondholders than he had the means of doing, or mismanage the trust property for the purpose of depreciating the price of the bonds, so that he could buy them at a greater discount." What equities, then, have the Ashuelot Railroad Company to urge as reasons why they should redeem their road by payment of a less sum than they have contracted to pay? We submit that they have none. And when it is recollected that these individual plaintiffs have no interest except what they purchased at a much larger discount than that of which they affect to complain in Mr. Elliot, and when it is considered that they purchased that interest, not for any purpose of self-protection, but as a sheer speculation, in order through a law-suit that they might put into their pockets great gains, although we may not say, in the technical sense, that they do not come with clean hands, we do insist that we are entitled to urge that they come with no special claims to favor from the court. See case as drawn by Mr. Justice HIBBARD. If this is not *maintenance* according to the old English law, it comes so near to it that it is difficult to perceive the difference.

The master finds that " when Elliot took possession of the road as trustee, or soon after, he understood that the stock of the Ashuelot Railroad was substantially extinguished by its bonds, and that he was acting as the executive officer of this organization, which he supposed to exist." Although not justified, as the conclusions reached in an earlier stage of this cause show, in that supposition, it was nevertheless a supposition founded upon the advice of distinguished men learned in

the law, as well as upon an act of the legislature which he could not presume unwarranted by the constitution. He acted in the utmost good faith, supposing such to be the condition of things; and everybody else having any interest in the matter accepted and acted upon that as the reality, and were satisfied with it as such. In these circumstances these individual plaintiffs, wakeful while innocence slept, purchased in these few shares of stock at a mere nominal consideration (see Mr. Justice HIBBARD's report), set this litigation on foot, and then come into court to complain that they are wronged by transactions in which at the time they took place they had not the slightest interest, which were marked by the utmost good faith, by which no one in interest at the time was injured, and of which no one then in interest has ever complained.

We do not claim that these circumstances change the equal rights of the parties; but we do think ourselves entitled to urge, that where the principles of equity are to be applied the court may and ought to be aware that such are the relative positions of the parties, and that the parties coming in in this way should not be heard to invoke the interposition of the court to enable them to obtain more than their strict equal legal rights.

It is to be borne in mind that the bondholders are not complaining of these transactions. Were they to come forward and claim the profits which Elliot may have made by his dealings in these bonds, the question would be a very different one. But what would be his position in such a case is not necessary here to discuss.

3. But the master finds that "by reason, in part, of the action of Elliot in buying up and concentrating so many of the Ashuelot bonds in the hands of the Cheshire Railroad while he was treasurer of the first road and director in the latter, the Ashuelot bonds have risen in the market from fifty per cent. of par value to par value, or nearly par value, and that the Ashuelot Railroad is prejudiced by this action, the extent of which it is impossible to state." Now, although not stated by the master, it is obvious that the way in which "this action" operates thus prejudicially is by so enhancing the market value of these bonds that the company cannot pay them off at a large or at so large a discount. But we submit, with entire confidence, that it was the clear duty of Mr. Elliot, to the bondholders whom he represented, to so manage his trust for them as to keep the bonds at the highest possible value. Had he not done this, and the bonds had depreciated by reason of his neglect, he would have been answerable to the bondholders for a mismanagement of his trust. Mr. Elliot was selected as trustee, or ought to have been if the company acted in good faith to their prospective creditors in bonding their debt, because of his known ability to manage the trust in the interests of the future bondholders. It was clearly for the best interests of the corporation, at the time, that a man of such ability should be so selected, as, if the trustee had been incompetent, the bonds would have been valueless, and the company would have been unable to obtain the credit they desired. At the time of this

transaction, had not something of the kind been done, instead of the bonds rising to nearly par, it is altogether probable that they would have sunk to little above nominal value. Had this been the case and the neglect could be shown, how would Mr. Elliot have stood, in the presence of the bondholders, in the light of such a result? We submit that he would have stood, both morally and legally, without excuse.

It clearly, as we insist, does not lie in the mouth of the Ashuelot Railroad, as a corporation, far less in that of these individual plaintiffs, to complain that Mr. Elliot has not allowed affairs to take such a course as to enable them to pay off their indebtedness at fifty cents on the dollar, or at any other sum less than the full amount. Whatever prejudice the company have received in this way is damage without injury, and that in the fullest sense.

4. As mortgagee in possession of the road, Mr. Elliot has managed his trust with fidelity, and in such a manner that the company have realized considerable gains from the use of their property; and it is no ground of complaint for them that he has not been unfaithful to their creditors, who had a right to claim his diligence in their interests. As trustee of the bondholders, Elliot would have been in fault if he had not looked well to their interests. His first duty was to them, and he cannot be made liable for having done his duty.

5. The Ashuelot bonds were due January 1, 1861, and, as we say, drew interest from that date. When that fact is considered, it shows that the bonds have never been at anything like par. They have only been worth ninety-three cents on a dollar, or equal to the Cheshire bonds. The latter had no interest included, while the former had interest from 1861 due on them, which was included with the principal, and all reckoned to make them up to par, or equal to the Cheshire bonds. In this view, the Ashuelot bonds have never been anywhere near par value. They have increased in value only as the interest accumulated, and are, aside from this interest, worth no more now than they were in 1861, say fifty per cent. of par value.

We may desire to reply to the plaintiffs' brief, and to add some suggestions of our own at that time.

In a subsequent brief they cited 1 Perry on Trusts, secs. 2, 22, 243, 431, 2 Story's Eq. Jur., secs. 964, 965, 966, 1013, *Cruwys* v. *Colman*, 9 Ves., Jr., 323, *Cholmondeley* v. *Clinton*, 2 Jac. & Walk. 1, *Clarke* v. *Sibley*, 13 Met. 210, *King* v. *State Mut. Fire Ins. Co.*, 7 Cush. 1, *Birch* v. *Wright*, 1 D. & E. 383, *Davis* v. *Barrett*, 14 Beav. 542, *Anon*, 1 Salk. 155, *Morret* v. *Paske*, 2 Atk. 52.

*F. A. Faulkner*, for himself, the estate of William Haile, and the Cheshire Railroad, contended that, in ascertaining the amount due upon the mortgage bonds, which the plaintiffs must pay in order to redeem from the mortgage, interest should be reckoned with semi-annual rests, on the first days of January and July in each year.

This would be according to the understanding of the parties, the spirit of the contract, and, I think, according to the letter. If a note

428 RAILROAD v. ELLIOT.

were given, payable in ten years from date, with semi-annual interest, no one would claim that at the end of ten years the contract became changed, by the breach of promise to pay the principal, from a contract to pay semi-annual interest to a contract, or a legal liability to pay simple interest merely. The express contract in this case is to pay $500, or $1,000, or whatever the principal sum might be, on the first day of January, A. D. 1861, with interest at the rate of six per cent. per annum, payable half yearly at the treasurer's office, on the first days of July and January of each year after the first day of January, A. D. 1851, upon the surrender of the corresponding warrants annexed to the bond. The surrender of the interest warrants was not of the essence of the contract, inasmuch as, if one should be lost or destroyed, the right to recover interest could not be defeated ; but the essence of the contract was, payment of the principal in ten years, and interest semi-annually until paid. Interest warrants, or coupons, were annexed to the bonds for the convenience of the purchaser, and to render the bonds more readily negotiable, as the coupons could be collected by mail, or through the agency of banks, thus dispensing with the necessity of giving a receipt for the interest paid, or producing the bond to be indorsed. It was required that the coupon should be surrendered, in order that it might serve as a voucher, but its surrender was not the condition of payment or consideration of the promise to pay. The promise in the body of the bond to pay interest semi-annually is absolute and complete, and the requirement that the coupon should be surrendered is merely incidental.

Upon what ground it can be claimed that the Cheshire Railroad Co. are entitled to interest only from the time of the purchase of the bond, I am at a loss to conjecture. They purchased these bonds in good faith, and for a valuable consideration. They stood in no relation of trust to the Ashuelot Railroad, which forbade them to purchase and make a profit from the obligations of the latter company. The bonds continued to bear interest after maturity, and the purchaser purchased the bond with its incidents—the interest which had accrued, as well as the principal. That they purchased the bonds at a discount wrought no injury to and cannot accrue to the benefit of the plaintiffs, who owed, and were bound to pay, the principal and accrued interest. If a note should be given payable in ten years, and at the expiration of fifteen years should be sold by the payee for its face, or less, could any one claim that the purchaser could not recover of the maker the principal and interest since the maturity of the note ?

2. The said Faulkner, in behalf of himself and said estate, will move that a receiver be appointed to collect and receive of Mr. Elliot such sums as shall be found by the court to be due from him as treasurer and trustee, and from the Cheshire Railroad Co. such sum as shall be found due from them as rents, ascertain the amount of bonds now outstanding and the amount due thereon, and distribute the sums so collected *pro rata* among the holders of such bonds in satisfaction *pro tanto* of their claims. A receiver, or some officer of the court or

some person appointed by the court, giving bonds for the faithful discharge of his duties, and acting under the direction of the court, would seem to be the proper person to discharge this office; and in this way all chance for future controversy or litigation will be avoided. The moneys in the hands of the treasurer, trustee, and Cheshire Railroad Co. consist entirely of the rents of the property mortgaged to secure the payment of these bonds, and should be appropriated solely to that purpose.

3. In behalf of the Cheshire Railroad Co., the said Faulkner suggests that any decree which may be made authorizing the plaintiffs to redeem should be upon such terms and conditions that the Cheshire Railroad Co. shall not be deprived of the value of the improvements which they have made upon the Y, leased to them for the term of ninety-nine years. In those improvements the Cheshire Railroad Co. have invested nearly $70,000, which sum they will be in danger of losing if a decree allowing the plaintiffs to redeem shall be made unconditionally. Judge HIBBARD reports that this lease was made in good faith, and that it was for the interest of the Ashuelot Railroad to continue it, but that the trustee had no authority to make it. The Cheshire Railroad having made these improvements in good faith, in the full belief that they were in the exercise of a clear legal right, ought now in equity to be protected. The provisions of sec. 6, ch. 213, Gen. Stats., known as the " Betterment Act," may not be strictly applicable to this case, but, being designed to work an equitable result where the enforcement of strict legal rights would work injustice, may be worthy of the attention of a court of equity in a similar case. Of the power of a court of equity, while granting the prayer for its equitable interference in a case of supposed wrong or hardship, to so shape its decree as to procure equal and exact justice to all parties, no question will be made by the plaintiffs asking " that equity may be done in the premises." I respectfully suggest, that, under the direction of the court, the value of the lands leased and of the improvements made be ascertained, and then that the decree be in accordance with the provision of sec. 8, ch. 213, Gen. Stats., or that, upon payment by the Cheshire Railroad Co. to the plaintiffs of the value of the land so leased, the plaintiffs shall release all title or claim to the same.

August 11, 1876, the following opinions were delivered :

LADD, J. We may look at the questions as they arise upon the master's report.

1. As to the account of Mr. Elliot as treasurer: When his active duties as treasurer were suspended, and his active duties as trustee began, January 1, 1861, he had in his hands, in the former capacity, funds of the corporation which were not afterwards used in discharging the functions of either office. From that time forward he held those funds as their trustee, and I see no good reason why the ordinary rule as to interest should not apply. My opinion is, that he should be

charged with the sum found in his hands by the master, January 1, 1861, with simple interest from that time to the date of the decree.

2. He should account for the Levi Chamberlain bond, according to the report.

3. No sufficient reason is shown for making any change in the statement of Elliot's account as trustee, made by the master, and I think he should be charged with the balance reported;—also, that he should be charged with the amount on deposit to pay coupons, in case the plaintiffs redeem or furnish proper security for the payment of the bonds.

4. I think the statement of account between the Ashuelot Railroad and the Cheshire Railroad, from January 1, 1861, to January 1, 1874, should stand as returned by the master, for reasons which will be given at length by my brother FOSTER.

5. Should Mr. Elliot be held to account for the profits he made by dealing in the mortgage bonds? Upon this point the views of counsel differ widely. The plaintiffs contend that he ought to hand over to the corporation all his profits, not only on bonds bought after his active duties under the mortgage began, but on $14,000 of those obtained by him before; while the defendant contends that the corporation have no such right, and that he ought not in equity to account for any profits made by dealing in the bonds, even while he was running the road in the active exercise of his duties under the mortgage. This question has been argued with great ability and much at length on both sides,—the contention on one side being, that Elliot sustained the relation of trustee to the corporation and the stockholders, and that this fiduciary relation incapacitated him to speculate in the securities which were the foundation of his legal title and right of possession;—on the other, that he was acting and was bound to act wholly in the interest of the bondholders; that his relations and duties to them necessarily made his position antagonistic to that of the plaintiffs, and such as to negative all idea of a trust in their favor.

Not much has been found in the books bearing directly upon this point. The usual practice in England is to mortgage only the tolls, accruing profits, or future calls, of the corporation—Perry on Trusts, sec. 750; and in this country, where the practice has been different, the legal character of the relation sustained by such trustee to the corporation and the stockholders, and the rights and liabilities dependent on and growing out of that relation, do not appear to have been much considered by the courts. Perry on Trusts, sec. 754, *et seq.* The *facts* of the relation sustained by Mr. Elliot to this corporation and its stockholders are within a narrow compass, and easily understood. He was, in the first place, their treasurer and clerk. Then they executed to him a mortgage of their property and franchise, not to secure a debt they owed to him, but to hold as security for the payment of their bonds, whoever might hold and own them. After the execution of the mortgage, for the ten years which elapsed between the issuing and maturity of the bonds, the corporation remained in possession of their mortgaged property, with all the rights and subject to all the duties incident to their

franchise. Mr. Elliot continued to act as their clerk and treasurer during this time the same as before, and in the latter capacity paid the interest on the bonds as the warrants were presented. So long as the interest was paid there was no breach of condition, and nothing for him to do in the way of an active performance of any trust under the mortgage. Thus far it was a dry and naked trust. But the bonds were not paid at maturity. By the terms of the mortgage it thereupon became the right of the trustee to enter and hold possession of the property for the purpose of realizing upon the security and enforcing payment of the debt. Mr. Elliot took possession of the road according to his right, and in the undoubted discharge of a duty he owed to the holders of the bonds. An act of the legislature was soon after obtained, which it was supposed on all hands had the effect to foreclose the mortgage, and so extinguish the interests and rights both of the corporation and the stockholders, and to invest the holders of the bonds, who thus became absolute owners of the road and franchise, with the substantial attributes of a corporation. The whole conduct of Mr. Elliot in managing the property from that time until the decision of the court in this case, reported 52 N. H. 387, was based upon this supposition, and, so far as regards any moral aspect it may present, is to be looked at with that fact constantly in mind. But the court held the statute, which was designed to operate as a foreclosure of the mortgage, ineffectual for that purpose; and so it turns out that Mr. Elliot has been in possession all this time, not as agent for the absolute owners of the road, but under and by virtue of the original mortgage as the representative and trustee of those beneficially interested as mortgagees. During all this time the corporation had the right to redeem by paying off the bonds, and for his services as trustee Mr. Elliot charged, and has been allowed by the master, compensation against the corporation.

It is not necessary to discuss the nature of his legal relations to these parties during the period from 1851 to 1861, while the interest was paid by the corporation and there was no breach of the condition of the mortgage. As has been said, the trust created in him by the mortgage was in the nature of a naked trust, and, under the circumstances, imposed no active duty whatever. The moment he took possession all this was greatly changed. His duty to the bondholders was plain and cogent. He must act promptly and efficiently on their behalf. He is their representative and agent, and is bound to take care of their interests with fidelity, and with such skill as he may possess. Their right is to be paid the mortgage debt, or, in default of payment, to have their title to the property and franchise made absolute by a foreclosure. These are the rights which he, as their agent and trustee, is to enforce and protect. He must manage the property judiciously, according to his best skill, in order that its earnings may go as far as possible towards paying the debt. Of course, prudent and efficient management of the property would have a tendency to maintain the credit of the corporation and enhance the market value of the bonds; and thus much he is bound to do, not especially because it may have the effect indicated,

but because such is the obligation imposed by the trust he has under-taken on their behalf. But here I think his duty to the bondholders in that direction ends. It clearly was no part of that duty to buy a large quantity, or a small quantity, of those bonds on his private account, for the purpose of carrying up their market price. It does not follow, because this was an act not required by his duty to the bondholders, that it was certainly inconsistent with that duty. We need not now deny his right, so far as regards the other bondholders, to buy the bonds fairly in open market, taking no advantage of his position and the knowledge gained therefrom to overreach the seller; although a court of equity would undoubtedly scrutinize such a transaction pretty carefully, even when the purchase is made before the active duty of the trustee begins, and no interests are involved but those of the bondholders. Mr. Perry says as much: "Doubtless they can purchase the bonds for which the mortgage stands as security in the open market; but they could not go among the bondholders and solicit the purchase of the bonds, for, holding the security for the bonds, their position and influence would be such, and the danger of fraud so great, that a court of equity would not allow the bargain to stand." Perry on Trusts, sec. 749.

The idea, that it was any part of his duty to the bondholders to purchase one third or one half the bonds, more or less, for the purpose of enhancing their market value, and so, to all practical intents, adding to the sum for which the corporation may procure the extinguishment of the debt, cannot be supported. He was bound, as already remarked, to manage the property well, and apply the earnings to the payment of the debt, and there, so far as regards any action for the purpose of enhancing the value of the bonds, his duty to the bondholders ended.

What was his relation to the corporation and its stockholders after he took possession of the road? Undoubtedly he was the representative of the beneficial mortgagees. In his relative character of trustee he was mortgagee, and, in all matters arising between him in that capacity and the corporation, he is to be regarded as a mortgagee in possession. But it is as trustee of the bondholders, and no otherwise, that he is mortgagee in possession. He does not act as an individual at all. The question we are to decide does not arise between the bondholders and the corporation, or between Mr. Elliott, as trustee of the bondholders, and the corporation, but between Mr. Elliot, in his individual capacity, and the corporation; and I do not see how it is affected one way or the other by the fact that as trustee of the bondholders he was a mortgagee in possession. Grant that in that capacity his interest and duty were antagonistic to that of the mortgagors, it is only in protecting and enforcing the rights of his *cestuis que trust* that his conduct is to be governed by the duty thus imposed. He certainly cannot justify an individual act, otherwise inadmissible, on account of his relations with the plaintiffs, on the ground that such act would have been admissible had it been done in his representative capacity. Suppose, as is said, a mortgagee in possession may buy in other incumbrances on the same property, or other demands secured by the same mortgage, for less

than their face, and then hold them against the mortgagor at par: what application has that to this case ? What other incumbrances were there to be bought ? Mr. Elliot, as trustee of the bondholders, and so mortgagee in possession, represented all the bondholders. It is plain that, as such trustee, he could not buy in any other incumbrances for a variety of reasons, among which, in addition to the one already given (that there were no others), may be mentioned the fact that he had no authority, express or implied, from his *cestuis que trust* to do so, and none of their money with which to make the purchase.

The simple statement of the matter is, that Elliot, in his representative capacity of trustee and mortgagee, bought no bonds. He bought them as an individual, and as an individual he was not mortgagee. So this is not the case of a mortgagee dealing in the incumbrances upon the estate.

What duties, if any, towards the corporation and the stockholders did Elliot's act in taking possession of the road impose upon him ? It was the deed of the corporation that made him trustee and agent of the bondholders, and clothed him with the character of mortgagee. It must be very clear that he cannot, as an individual, or as mortgagee in trust, owe any duties to the mortgagors inconsistent with the duty he owes under the deed to the bondholders. Full effect must be given to the deed through him, and the legal rights of the beneficial mortgagees are not to be impaired by any act done by him, whether in the interest of the mortgagors or in his own individual interest. It may be admitted that, as trustee of the bondholders, he owes the mortgagors no duties except those which the law imposes upon mortgagees in possession ; but, at the same time, I think it cannot be denied that as an individual he stands in a relation to them of great delicacy as well as responsibility. Without any personal interest he is in possession of their property and franchise, holding under the deed, primarily for the benefit of the bondholders, ultimately, when the bonds are paid, for the corporation and the stockholders. The corporation created the trust in favor of the bondholders. He was selected and appointed by them, and in view of the very important duties that all knew might eventually arise, he must have been chosen on account of his known or supposed ability to do well what by the provisions of the deed might in the end be required of him. Such a selection on the face of it implies high personal confidence and trust. By accepting the position and entering upon the active performance of its duties, he took upon himself, as it seems to me, an implied obligation to protect and preserve the interests and rights of the corporation, just as much as he did to enforce the rights of the bondholders under the mortgage ;—nor were his duties to these parties really at all repugnant or incompatible. With respect to the management of the property, which was in reality the main thing to be attended to, their interests were identical. The legal interest of the bondholders was, that the bonds be paid ; the interest of the mortgagors was clearly the same. Each interest alike called for a wise and efficient management of the road. The legal rights of the

mortgagors were the exact counterpart and complement of the rights of the mortgagees. His duty to one commenced just where his duty to the other ended. There was no clashing, but still no open ground which any other interest could be permitted to invade. Nothing was called for but a just and disinterested administration of the affairs entrusted to him, with a single eye to the rights of the two parties, whose interests were thus placed in his care. Any act done by him in this situation of things, whereby his own private interest as an individual should be brought into antagonism and hostility to the interests of the mortgagors, would, in my judgment, be just as much a renunciation of his implied obligations to them, just as much a breach of the duty and trust he had undertaken on their behalf, as would an act bringing his individual interest into hostility to those of the bondholders be a breach of his duty to them.

*Sturgis* v. *Knapp*, 31 Vt. 1, was a case where there had been a mortgage of a railroad and its franchises to A and B, as trustees for bondholders. The questions in that case did not rise until after there had been a foreclosure of the mortgage; but some observations in the opinion of the court, delivered by Chief-Justice REDFIELD, are quite pertinent, and I quote them. He says (p. 52),—" The first and the great inquiry in the case is in regard to the nature of the estate in the trustees created by the mortgage, the forfeiture, and the foreclosure.

" It is obvious that the estate must depend very much upon the implications growing out of the relations of the parties and the duties consequent thereon; and that these may change from time to time, as circumstances change. That which begins as an active responsible and fiduciary trust, may, by lapse of time and intervening relations, become merely a naked, dry trust, and *vice versa*. The nature and character of all trusts depend almost exclusively upon the implications growing out of the state of the property, and the purposes desired to be accomplished, and the mode provided for that end. And it is one of the most important, and at the same time one of the most delicate and difficult, offices of a court of equity, to raise these implications, with wisdom and justice, so that the full purpose and object of the trust shall be effected without violence or forced construction of the instrument under which the trusts are created.     *     *     *

" There are extensive trusts connected with the whole subject of corporate action, which come under the class of what in the books are denominated constructive or implied trusts. In one sense, the corporation itself is a mere trustee, holding all its funds and all its powers and franchises in trust for the shareholders, who are the ultimate *cestuis que trust*.

" The persons to whom these mortgage bonds are payable have not only the express trusts to perform, which are created by the terms of the deed under which they are made trustees, but they are also constructively trustees (after the forfeiture and taking possession of the road, which they may always do after condition broken) for subsequent incumbrancers, for the corporation, and ultimately for the shareholders themselves.     *     *     *

"After the forfeiture occurs, either by non-payment of interest or principal, or both, as in the present case, the duties of the trustees became not only active and responsible, but critical and delicate. It not only is not a dead, dry trust, but is one of the most active and momentous responsibility. We presume no man who had ever been placed in such a position, and who had any proper sense of his position, would ever think of regarding or treating it as in any sense a trust of a nominal or indifferent character.     *     *     *

" After the surrender and before foreclosure, as we have before intimated, while the control of the road for the benefit of the bondholders might fairly be presumed to be temporary, it could not with the least show of propriety be expected that any change in the principle of their mode of action should be attempted. Any one who accepted the office of trustee under a contract of this character must be supposed to look directly at the reasonable probability of the occurrence of this contingency—the failure to pay promptly—and to have assumed his position with reference to the new duties resulting from the occurrence of such contingency, and would consequently be bound to perform the duties arising from it; and all the parties in interest—the bondholders, the creditors of the corporation in the order of their priority, the corporation itself, and, ultimately, the shareholders—will have a vested interest in having these duties performed by such trustees under the security of their responsibility and capacity, both pecuniary and personal."

It is true, as the defendant says, that the legal liability of the corporation upon the bonds has all the time been to pay their full amount, with interest, to the holders. It is at the same time true, that when the bonds are selling in the market or otherwise at fifty cents on a dollar, the debt might be extinguished by the corporation for one half the amount they are legally liable to pay. The actual value of the bonds was all the time measured by the amount for which they could be sold, and this would depend upon the understood ability of the corporation eventually to pay them in full. Now, when Mr. Elliot, after he had taken possession of the road under the mortgage, became the owner of $46,000 of the bonds secured thereby, his individual interest lay strongly in the direction of enhancing their salable value, and so of increasing the amount for which the corporation might procure the extinguishment of the debt and remove the mortgage. The master finds that his buying up the bonds was in part the cause of advancing their price from about fifty per cent. to about par. His duty to the bondholders did not call for any such private speculation for such a purpose; and even though it should be said that a legal wrong was not thereby done the mortgagors, inasmuch as their undertaking was to pay the full face of the bonds, the proceeding, nevertheless, strikes my mind as quite inconsistent, in an equitable point of view, with the relation of confidence and trust in which he stood to them.

The reasons for scrutinizing with considerable care the acts of one situated as this trustee was, and applying the equitable rules relative to the conduct of trustees with a reasonable degree of strictness, seem to

me, indeed, strong and imperative. He has the whole control and management of the road. His position necessarily gives him means of knowing its present resources and future prospects, possessed by no one else. By accepting that position he assumed obligations to all the real parties in interest altogether inconsistent, as it seems to me, with the interposition of any private and personal interest of his own. With respect to the duties thus voluntarily assumed, the individual was absorbed as it were in the trustee. The interest of the corporation, which he was bound to protect so far as he could without infringing the legal rights of the bondholders (also in his keeping), lay in the direction of extinguishing the debt. In his relative capacity he represented the debtor and creditor both. A purchase of bonds by him on behalf of the corporation would be an extinguishment of the debt *pro tanto*. In doing that he would not be buying of his *cestuis que trust*, because as purchaser he would represent the debtor. If as an individual he may buy the bonds, that would be, in the first place, a purchase by a trustee of his *cestuis que trust*, and, in the second place, would to that extent change his position from that of a trustee with no interest but to preserve the just and legal rights of both debtor and creditor, to that of a creditor having in his control and management the property of the debtor wherewith to pay himself. In this view his purchase of bonds ought to be and must be treated by a court of equity as an act done by him in the line of his duty to the corporation, and on their behalf, and so an extinguishment of the debt to that extent. That brings us practically to the same result as holding him to account for profits,—for it is clear that his assignment of the bonds, long after maturity, to the Cheshire Railroad, of which corporation he was at the time a director, could give that corporation no greater or different rights with respect to them than he possessed himself, for the reason that in making such transfer he undertook to act as buyer and seller both; and hence it follows that it makes no difference, so far as regards his account as trustee, whether he be charged with the profits realized, with interest, or held to procure the surrender of the bonds upon payment of the sum advanced by him in their purchase, with interest on that sum.

Upon the best consideration I have been able to give the subject, and an examination of all the authorities to which we have been referred, I am of opinion that the purchase by Mr. Elliot on his private account of the $46,000 bonds was not compatible with the duty he owed the corporation in the performance of his trust under the mortgage, and that he ought in equity to account to them for the profits realized in that transaction. (And I base my conclusion upon the broad ground that the moment he entered upon the active duties of that trust his relation and his duties to both parties became fixed, so that he could not, by buying up all the bonds, for example, throw off the character of trustee for bondholders with which he was invested by the deed of the corporation, and in which he began to act, and assume that of owner of all the bonds, and so of actual beneficial mortgagee in possession. This could not have been contemplated when the corporation selected

him (their own treasurer and clerk) to act in that capacity, and, as I have already said, would be entirely inconsistent with the implied obligations which he thereby assumed. It need not be said that to hold a different rule would be to hold out the most direct encouragement to trustees in such a situation to mismanage the property for the purpose of depreciating the bonds in the market, so that they may be able to buy them for less than their actual worth.

I think Mr. Elliot's duties to the Ashuelot Railroad Corporation and its stockholders assumed the character which should forbid a purchase of the bonds for his own individual gain the moment he took possession of the property under the deed ; and, in the absence of all bad faith or actua .wrong intent, I think he should not be held to account for profits on the bonds owned by him at that time ;—but as to the $46,000 purchased afterwards, he should be held to account for the profits actually realized, according to the report of the master, with simple interest from the time they were exchanged for the Cheshire bonds to the date of the decree. In estimating the amount of these profits, there should be deducted simple interest on the sum paid for the bonds, from the time it was thus advanced by him in their purchase to the time of the exchange.

The next question is, What are the Cheshire Railroad entitled to receive upon the bonds held by them ? What has been said with reference to the duty of the trustee, in my judgment shows the basis upon which this matter must be determined. In procuring and making over those bonds to the Cheshire Railroad, Mr. Elliot was acting as their agent, and one of their directors. That corporation were chargeable with all his knowledge in the premises. In fact, his knowledge was their knowledge, the same as his action was their action. It seems to follow quite conclusively that they are entitled to receive the same that Mr. Elliot would have been entitled to receive, had he procured all the bonds for himself personally, and retained them in his own hands. What is the result ? As to the $24,000 owned by Mr. Elliot at the time he took possession, the Cheshire Railroad are entitled to the full face of the bonds, with interest from January 1, 1861. As to the remaining $136,000, they are entitled to the amount they paid for them, with interest from the time it was paid.

I think all interest on these bonds after January 1, 1861, should be reckoned at six per cent., without rests ; and I put this on the ground that by a true construction of the contract, interest after the breach— after all the interest warrants had been presented and paid—is recoverable, not upon and by virtue of the original contract, but as damages for the detention of money due.

Of course the representative of Mr. Haile, Mr. Faulkner, and other holders of bonds if there are any, are entitled to the face of their bonds, with simple interest, from the time of their maturity to the time of payment.

I do not see but that the lease of land in the Y must be declared void

after the surrender of the mortgaged property, in accordance with the finding of Judge HIBBARD ; but I think equity requires that the decree should be shaped in such way as not to deprive the Cheshire Railroad absolutely of their betterments. I see no legal objection to the course proposed by my brethren, and agree to the result reached by them on this point.

As to the land in Winchester purchased by the trustee, I am of opinion that the plaintiffs are not bound by that purchase, and need not take and pay for the land unless they choose.

SMITH, J.   It appears that the Cheshire Railroad has erected betterments upon the premises called the Y to a very large amount, stated at $70,000.   That corporation took a lease of those premises from Elliot, acting as the trustee of the bondholders, for ninety-nine years, in good faith, all parties understanding that the mortgage had been foreclosed.   The plaintiffs ask to redeem their property, including this tract of land, from the mortgage.   It would be grossly unjust to allow the premises to be surrendered to the plaintiffs with all these improvements, without payment therefor.   As they come here asking that equity may be done them, they must, according to the familiar rule, do what is equitable in return.   In shaping the decree, therefore, in this case, it should be done so as to work out an equitable result.   If the plaintiffs had brought a suit at law to recover the Y, the Cheshire Railroad could, under ch. 213, sec. 8, Gen. Stats., claim the benefit of the improvements, and the judgment would be made up accordingly.   This proceeding is in effect an action, among other things, to recover the possession of this piece of land.   In order to prevent great injustice, the value of the land and of the improvements should be ascertained, and the decree should then be shaped substantially in accordance with ch. 213, sec. 8, Gen. Stats.   The value of the betterments must be ascertained by a hearing before the circuit court, or by a further hearing before the master.

Unless the plaintiffs give security to the satisfaction of the circuit court, a receiver should be appointed to receive the amounts that may be found due from the defendants, and distribute the same among the bondholders.

As to the other questions raised in this case, it is only necessary for me to say that I concur in the views so fully considered and expressed by my brothers LADD and FOSTER.

FOSTER, C. J., C. C.   I. I find nothing in the case nor in the arguments which suggests any error in the computation by which the master finds a balance of funds in the hands of Elliot as treasurer of the Ashuelot Railroad, January 1, 1861, of $10,451.50.

The master has indicated the sources from which this sum is derived, and I am unable to see why Elliot, who has retained this sum, always claiming that he had the right to retain it on the ground that it was insufficient to compensate him for moneys due to him from the corpora-

tion, should not be charged with interest upon that balance from the time when his duties as treasurer were substantially ended, January 1, 1861.

I see no reason why any other rule as to interest should be applied than that which ordinarily is applied to an account due, viz., six per cent. simple interest.

II. Elliot has derived no interest or advantage from the amounts which were deposited to his credit as treasurer in the Ashuelot and Cheshire banks, viz., the sums of $221.03 and $207.50. These sums he should account for without interest.

III. The findings and legal conclusions of the master as to the transactions concerning the Chamberlain bond should be affirmed as the judgment of the court.

IV. So also with regard to the Samuel Towns stock.

V. I see no occasion to revise the findings of the master with regard to the amount with which Elliot is chargeable as trustee, viz., $2,025, and interest at six per cent. on funds of the Ashuelot Co. used by Elliot.

VI. With regard to Elliot's transactions in relation to the Ashuelot and the Cheshire bonds: I have read and considered with great care and anxiety the arguments of counsel upon either side, and I have endeavored to examine the authorities and the books, to discover the proper application of the law to this case, which, though anomalous in some respects, seems to fall nevertheless within the limits of fundamental rules.

Mr. Elliot fell into the mistakes and errors which involved other officers of the two roads, with regard to the effect of an attempted foreclosure of the mortgage, and which led to negotiations upon a false basis, erroneously but innocently assumed to be correct and well founded. And I take the liberty, irrelevant though it may be, but prompted and urged by considerations of long personal acquaintance and esteem, to remark that my confidence in Mr. Elliot's personal integrity is not impaired by the developments of this case.

But I am quite unable after all to dissent from the judgment and opinion of the court, as rendered at the August term, 1874,—a judgment and opinion which, if unreversed and if well grounded, seems to preclude very much of the subsequent discussion to which we have respectfully and very attentively listened.

It was then considered and declared as follows: "Upon the facts stated in the printed case with respect to Elliot's dealings in the bonds of the Ashuelot R. R. Co., after he took possession of the road as treasurer, no reason is now seen why he should not account to the corporation for the profits of those transactions.

"We think it impossible to sustain the view of his counsel, that his relation to the corporation after he took possession under the mortgage was not that of a trustee. Undoubtedly he represented the bondholders in respect of their rights and interests by virtue of the mortgage, but we think it equally clear that he represented the corporation in respect of their rights and interests in the mortgaged property. All his

title, and all his right to possess and manage the property, was a trust. As to the mortgage debt, the real mortgagees, that is, the bondholders, were his *cestuis que trust;* as to the property itself, and the equity of redemption, the mortgagors, *i. e.,* the corporation, were his *cestuis que trust.* The bonds formed the whole basis of the trust. With their extinguishment, his legal title and his consequent legal rights to the possession of the road would be gone. His general duty to the corporation lay in the direction of their extinguishment. It is not impossible but that his private interest might, in some contingency, be in the opposite direction. At all events, from what now appears, it is plain enough, we think, that he could not speculate in those bonds for his own private gain, without violating very fundamental principles established for the government of those sustaining this fiduciary relation to others, and approved by the courts of equity from the earliest times."

Whether there be any good reasons for the distinctions attempted to be drawn by counsel as to the kind of trust here existing, and the kind of trustee which Mr. Elliot may be said to have been ; whether the trust and the trustee may be denominated special, general, technical, constructive, or equitable,—it must be conceded that his relations to all the parties (whether as debtor, or creditor, or mortgagee, or trustee, in connection, also, with other official relations to the two roads) were of a fiduciary character, and were very close, intimate, and confidential.

And they were relations to which the fundamental principles of equity apply with such stringency as absolutely to forbid any such conduct or dealings with the property subjected to his control as should place his individual interests in a state of antagonism with those of either the bondholders or the makers of the bonds.

That as trustee and mortgagee, in possession or out of possession, he might lawfully be at the same time an owner and a purchaser of bonds, need not be denied ; and that, to some extent, these several positions of the same individual may have been inevitably antagonistic and his interests conflicting ;—and in such a complication of circumstances his situation was one of such extreme delicacy as, it would seem, should have prompted the design and effort on his part to escape from the complication.

But, standing upon this delicate ground, and consenting to these environments, he was bound to submit to the situation, and so far ignore his individual interests, and so far resist all temptation of personal advantage, as, while striving to subserve the best interests of all, whose agent, in any sense, he was, to permit himself individually to receive no more than strictly and purely incidental advantages. The moment he permitted himself to make a profit to the disadvantage of either party, so far as that profit was not a purely incidental result, unachieved by any interference with affairs outside the strict line of his no doubt embarrassing duty to the parties whose middle man, in a certain sense, he may be said to have been, that moment he became responsible to account to the party prejudiced by his transaction for all the

profits thereof. There was no point of time and no status of position in which, as to the mortgage creditors or the mortgage debtors, he could be permitted to make the interests of either party subservient to those of himself as an individual, without violating the fundamental principles which are established for the protection of those who place faith and confidence where confidence and faith are invited and accepted. If a man cannot serve two masters, much less can the agent of two masters reverse his position so that the servant shall constitute himself the master of either.

When Elliot took possession of the road for the bondholders, he was charged with the duty to enforce their claims and protect their rights strictly and faithfully. Their rights were, to have their bonds paid, or the mortgage foreclosed for their benefit. His duty as mortgagee in possession was, so to manage the property as to make it most available for the payment of the bonds. And the more prudently it was managed, the more were the bondholders benefited by the preservation and enhancement of the value of their securities ; while, at the same time, the stockholders were in like degree benefited by the preservation and enhancement of the value of the means for the extinguishment of their debts. The interests of the debtors and the creditors were therefore, to a great extent, alike, if to some extent they were seemingly antagonistic.

In so far as prudent management of the road tended to enhance the value of the bonds by sustaining the credit and value of the security, so far the market value of the bonds was increased, and holders could hold or sell at advantage. In so far as the road might be impaired by bad management, so far the market value of the bonds would be diminished, and holders would hold or sell at a disadvantage and loss. His duty to the bondholders, then, required him, by all fair and upright means—fair and upright towards the debtors as well as the creditors— to maintain the price and value of the bonds.

On the other hand, in so far as the price and value of the bonds in the market were diminished, in whatever way, so far the corporation was benefited by the diminution, because the sum was thereby diminished for which the corporation might procure the extinguishment of their debt.

But it was not in the line of his duty, but contrary to his duty to both parties, to speculate for his own private advantage, and so disturb the current of an even and equable stream as to give to the bonds a fictitious or an unnatural value,—by which I mean, a value not determined by the ordinary influences affecting the market, independent of his own private and individual speculations.

Just so far as for his personal advantage he enhanced the price of the bonds, so far he deprived the stockholders of a sum of money, to the extent of which, but for his interference for purposes of personal gain, their debt would have been diminished ; for their debt or obligation was a sum not arbitrarily fixed by the denomination of their bonds, but by the fluctuating price of such securities in the commercial world. Now, the result of Mr. Elliot's transactions and its effect upon

these interests is declared to be, a profit to himself to the detriment of others whose interests he was bound always to regard as dominant. I do not understand it to be insisted by his counsel that Elliot did not avail himself of his peculiar position and advantages for knowing much better than the public knew the true condition of the corporation, which enabled him to obtain their bonds at less than their true value; but their consolidation in his own hands under these circumstances is regarded as defensible.

I cannot so regard it. That which would be all right in an outsider, and a fair result and reward of shrewdness and financial ability, is all wrong in the case of one who, holding the confidential position of a trustee, seeks his personal advantage to the disadvantage of those whose interests are placed within his control and under his protection. I therefore concur with my brethren in the opinion that Mr. Elliot must account to the Ashuelot Railroad for the profits of $31\frac{1}{2}$ per cent. on $46,000, with interest, regulated and allowed as indicated by my brother LADD.

VII. With regard to the Winchester land: If now, as at the time of the hearing before the master, the Ashuelot Co. disclaim any interest in the deed, it must be regarded as the property of Elliot. There was nothing in the official relation of Elliot to the road which authorized him to purchase the land in their behalf, and, although the purchase was doubtless made in good faith, he cannot compel the road to ratify it.

The Cheshire road must account to the Ashuelot road for the value of this property, for the reasons and in the manner suggested by the master.

VIII. It appears from the case that the Ashuelot road was leased to the Cheshire by an agreement taking effect January 1, 1861, the validity of which is not disputed. This was a lease for nine months, with liberty to the lessees, upon its termination, to revive it and keep it in force till January 1, 1865, at $12,000 per annum.

On the first of July, 1861, Elliot, as trustee, contracted with the lessees for continuing the lease from October, 1861, till January, 1865, on the terms that the lessees should have the first $12,000 of the gross earnings, the lessors the next $6,000, and the excess to be divided equally between them.

Whether Elliot, as trustee for the bondholders, had power to bind the Ashuelot road by this contract or not, the agreement was (with the exception only of the provision for dividing the surplus earnings above $18,000 between the two roads) simply the practical election of the Cheshire road to keep the lease of January, 1861, in force and effect till January, 1865. This they had a right to do, independent of any new contract with the lessors; and this agreement for the extension thus made in July, 1861, to take effect in October, 1861,—an agreement made prior to the time when Elliot became a director in the Cheshire road,—was made, as the case shows, in good faith, and was acted upon in good faith by all parties.

It was an agreement advantageous to the lessors, since it provided for an additional rent to the extent of one half the surplus of the gross earnings above the sum of $18,000.

But in 1862 Elliot became a director, being also then and ever since a large stockholder, in the Cheshire road ; and subsequently, October 1, 1864, still being such director and stockholder, as well as trustee for the lessors, he contracted with the lessees for the further extension of the contract of January, 1861, as modified in October, 1861, until such time as it should be terminated by a notice from either party to the other, with a further modification to the effect " that taxes and contingent charges " should be paid from the gross earnings after the distribution of $18,000, as before provided, before there should be a division of the remainder of the surplus. This contract continued in operation till January, 1868, when a new agreement was made, under which the parties have acted ever since, the purport and effect of which were to allow the Cheshire Railroad to reimburse themselves for the expenses of operating the Ashuelot road from the earnings of the latter, requiring them to pay over all the surplus to the trustee.

Now it is quite clear to my mind that Elliot was incapacitated to make a legal contract or lease with the Cheshire road, of which he was a director. The legal principle is elementary, that a man cannot lawfully contract with himself, or with himself and others, whether, in the position of either contracting party, he act as a principal or as an agent.

But it has been definitely settled in this case that none of the contracting parties acted collusively or fraudulently, but that the trustee, as well as the Cheshire Railroad, acted in good faith in making all these contracts. In good faith they have always acted under them, supposing them to be valid and of full effect ; and, although the accounts between the trustee and the Cheshire Railroad have not been settled and adjusted in accordance with these several contracts, yet payments have been made from time to time, if not in express recognition of the continuing validity of the several contracts, still, without any effort by any party to abrogate, or repudiate, or ignore their vital existence, and without any expression of dissatisfaction with the practical operation of the roads under supposed valid subsisting agreements.

The presiding judge, at the trial of this cause, has found that all these contracts are valid, unless it shall be otherwise determined by this court, by reason of the incapacity of the trustee to contract with the Cheshire Railroad. And the master has stated the accounts between the two roads upon the basis of the continuing validity of all these contracts.

To this the plaintiffs now object. They claim that the Cheshire Railroad are bound by all these contracts, legally and equitably, but that they, the plaintiffs, are entitled to elect as to which, if any, shall operate upon them ;—and thus they contend in argument,—

" 1. That the Cheshire Railroad Co. is bound by the contracts, as found by Judge HIBBARD, and cannot object to the validity of any of

them. Those made before Elliot was chosen one of its directors, it does not object to, but admits.

" That those made after he became, by its own interposition and election and by his own consent, one of its directors, and in which he was pecuniarily interested, the Cheshire Railroad Co. cannot object to, but it is legally and equitably bound by them at the election of the *cestuis que trust.*

" 2. That no new contract, or any modification of any existing contract at the time he was chosen director of the Cheshire Railroad Co., made by him as trustee of the Ashuelot Railroad Co. with the Cheshire Railroad Co., in which he was not only an active director but had a pecuniary interest, can bind the *cestuis que trust*—the Ashuelot Railroad Co.—unless it approves of them, and elects to take the benefit of them. Now, the result of this would be to leave the lease of 1861, as modified by the trustee, July 1, 1861, in full force, even to the present day, at the option of the *cestuis que trust;* or, at his option, to leave the same lease, as modified October 1, 1864, as found by Judge HIBBARD, in full force to the present time, leaving it open to him to object to the legal power of the parties to cancel or modify that contract, or claim any rights under that of January 1, 1868. And inasmuch as the contract of 1864 is substantially the same as that of 1861, modified in the interests of the Cheshire Railroad Co., only in a manner that upon its face would not seem unjust,—and inasmuch as the master's report for four years is based upon that contract, and could not be corrected only by a delay which would be more detrimental to the plaintiffs than the amount they would gain,—they therefore will accept and adopt the contract of 1864, and object to that of 1868 as of no binding force upon them."

But the recognition and enforcement of this doctrine by a court of equity would, I conceive, operate as a great surprise upon all parties who have for the last ten years been concerned in the practical management of these roads. To learn at this late day that equity and good conscience require that the Cheshire Railroad Co. should pay, and the Ashuelot road receive, twenty to thirty thousand dollars more than anybody ever claimed, by force of any supposed existing arrangement or understanding, would be an experience which the parties in interest, I apprehend, have not heretofore ventured to contemplate.

The plaintiffs' learned counsel cannot really mean it—I am sure he does not ; for, having distinctly enough announced such a proposition, I observe the speedy recoil of his conscience and sense of honor in a subsequent statement of his client's position, thus : " The plaintiffs in this case, believing their position fully justified it, therefore asked the court to charge the Cheshire Railroad Co., from 1868 up to the present time, according to the lease of 1864. This would modify to some extent and increase considerably the amount which the master has reported due under the contracts of 1868, found in force by Judge HIBBARD, subject to the exception of the *cestuis que trust.* By merely claiming this as their legal right in this case, the plaintiffs do not

waive, or intend to waive, their rights as found by Judge HIBBARD and the master ; but if the court should come to the conclusion that their claims, as above made, are not well founded in law and equity, they ask that their rights, as stated by Judge HIBBARD and the master, under instructions of the court, be enforced."

The plaintiffs' counsel express the opinion that by holding the contract of 1864 to be a continuing contract at the option of the *cestuis que trust*, substantial justice will probably be done. But we cannot encounter the investigation of those probabilities by undertaking to substitute for the contract under which all parties in interest supposed they were acting, and with the terms and the practical operation of which they were apparently contented, another and entirely different contract, being the same which had become obsolete and been repudiated.

The plaintiffs came into court seeking equity, and they ought gracefully to recognize and conform to the maxim in such cases made and provided. How, then, stands the matter, and what equitable solution of the difficulty is practicable ? I think the careful consideration of the case as presented to the presiding judge upon the trial of this cause, and the minute and critical examination of affairs accomplished by the master, have produced a result which we ought not to disturb,—that result being a settlement upon the basis of the contract of 1868,—not because that contract is of force and validity, but because in past and existing circumstances its recognition has afforded a just and reasonable and satisfactory basis of negotiation and practical experience.

Elliot had the power to make the contract of 1861. The Cheshire road, by the express terms of that contract, had power to extend its operation to 1865. Elliot had no power to make the contract of 1865, nor that of January, 1868 ; and these, whatever may have been supposed, have never had any validity in fact. But it by no means follows, that, because the contract of 1865 and that of 1868 never had a beginning, therefore the contract of 1861 never had an end. The contract of 1861 expired by the force of its own limitation at the end of the year 1864, since which time there has been no express, succeeding contract. There was no valid subsisting contract between the parties after the extinction of that of 1861, but when that contract expired nobody ever supposed they were any longer acting under it.

I am not aware of any legal principle which raises the conclusive presumption of a continuance and perpetuation of an existing state of things after the lapse of time specially provided and limited for the existence of such a state of things ; but such presumption, if it arises at all, must be rebutted by evidence of an attempt (unsuccessful though it may be in legal effect) to inaugurate, and the practical recognition of, an entirely different status, policy, and plan of conduct.

IX. I agree entirely with my brother LADD, that the lease of land in the Y must be declared void ; but I also fully concur with my brother SMITH in the opinion that in equity it should be decreed that the land be surrendered to the Ashuelot road only upon a proper allowance to

the Cheshire for betterments, the amount to be determined by the master or the circuit court.

And I am of the opinion that a receiver should be appointed, unless the plaintiffs give security.